**UNITED STATES of America,
Appellee,**

v.

**Samuel ROTH, Appellant.**

**No. 387, Docket 24030.**

United States Court of Appeals
Second Circuit.

Argued June 6, 1956.

Decided Sept. 18, 1956.

Writ of Certiorari Granted Jan. 14, 1957.

See 77 S.Ct. 361.

Philip Wittenberg, New York City (Wittenberg, Carrington & Farnsworth and Irving Like, New York City, on the brief), for appellant.

George S. Leisure, Jr., Asst. U. S. Atty., S. D. N. Y., New York City (Paul W. Williams, U. S. Atty., New York City, on the brief), for appellee.

Before CLARK, Chief Judge, and FRANK and WATERMAN, Circuit Judges.

CLARK, Chief Judge.

This is an appeal by Samuel Roth from his conviction for violation of 18 U.S.C. § 1461. The indictment contained twenty-six counts charging the mailing of books, periodicals, and photographs (and circulars advertising some of them) alleged to be "obscene, lewd, lascivious, filthy and of an indecent character." Three counts were dismissed. After a trial the jury found defendant guilty on four counts, and not guilty on nineteen. The trial judge sentenced defendant to five years' imprisonment and to pay a fine of $5,000 on one count, while on each of the other three counts he gave a like term of imprisonment, to run concurrently, and a $1 fine remitted in each case. On this appeal, defendant claims error in the conduct of the trial, but once again attacks the constitutionality of the governing statute.

■ This statute, 18 U.S.C. § 1461, originally passed as § 148 of the act of

June 8, 1872, 17 Stat. 302, revising, consolidating, and amending the statutes relating to the Post Office Department, and thence derived from Rev.Stat. § 3893, herein declares unmailable "[e]very obscene, lewd, lascivious, or filthy book, pamphlet, picture, paper, letter, writing, print, or other publication of an indecent character,"[1] and makes the knowing deposit for mailing of such unmailable matter subject to a fine of not more than $5,-000 or imprisonment of not more than five years, or both. In United States v. Rebhuhn, 2 Cir., 109 F.2d 512, 514, certiorari denied Rebhuhn v. United States, 310 U.S. 629, 60 S.Ct. 976, 84 L.Ed. 1399, Judge Learned Hand, in dealing with a claim of unconstitutionality, pointed out that it had been overruled in Rosen v. United States, 161 U.S. 29, 16 S.Ct. 434, 480, 40 L.Ed. 606, "and many indictments have since been found, and many persons tried and convicted. * * * If the question is to be reopened the Supreme Court must open it." Since that decision many more cases have acknowledged the constitutionality of the statute, so much so that we feel it is not the part of responsible judicial administration for an inferior court such as ours, whatever our personal opinions, to initiate a new and uncharted course of overturn of a statute thus long regarded of vital social importance and a public policy of wide general support. It is easy, in matters touching the arts, to condescend to the poor troubled enforcement officials; but so to do will not carry us measurably nearer a permanent and generally acceptable solution of a continuing social problem.

Against this background we are impressed by the decision this year of a great court in Brown v. Kingsley Books, Inc., 1 N.Y.2d 177, 151 N.Y.S.2d 639, 641, 642, 134 N.E.2d 461, 463, where, accepting general constitutionality of such legislation, the decision breaks new ground in upholding authorization of preventive relief by way of injunction at the suit of

---

1. As pointed out below, the quoted wording was somewhat expanded by Congress in 1955, after the commission of the offenses here involved.

a public officer.[2] In his opinion, Judge Fuld summarizes the controlling law thus: "That clearly drawn regulatory legislation to protect the public from the evils inherent in the dissemination of obscene matter, at least by the application of criminal sanctions, is not barred by the free speech guarantees of the First Amendment, has been recognized both by this court [citing cases] and by the United States Supreme Court [citing cases]." Among cases from New York which he cites is People v. Doubleday & Co., 297 N.Y. 687, 77 N.E.2d. 6, affirmed by an equally divided court, 335 U.S. 848, 69 S.Ct. 79, 93 L.Ed. 398, while among the cases in the United States Supreme Court upon which he relies are United States v. Alpers, 338 U.S. 680, 70 S.Ct. 352, 94 L.Ed. 457; Winters v. People of State of New York, 333 U.S. 507, 510, 518, 520, 68 S.Ct. 665, 92 L.Ed. 840; and United States v. Limehouse, 285 U.S. 424, 52 S.Ct. 412, 76 L.Ed. 843. He goes on to say: "Imprecise though it be—its 'vague subject-matter' being largely 'left to the gradual development of general notions about what is decent' (per L. Hand, J., United States v. Kennerley, D.C., 209 F. 119, 121)—the concept of obscenity has heretofore been accepted as an adequate standard." In the case last cited, Judge Hand asked [209 F. 121], " * * * should not the word 'obscene' be allowed to indicate the present critical point in the compromise between candor and shame at which the community may have arrived here and now?" and continued: "If letters must, like other kinds of conduct, be subject to the social sense of what is right, it would seem that a jury should in each case establish the standard much as they do in cases of negligence." In quoting this with approval, the Ninth Circuit has recently said: "We think Judge Learned Hand was in the best of his famous form in his happy use of words." Besig v. United States, 9 Cir., 208 F.2d 142, 147.

■ So this important social problem, which has come down to us from English law and which has led to statutes of a generally similar nature in almost all of the other jurisdictions in this country, see Brown v. Kingsley Books, Inc., supra, 1 N.Y.2d 177, 151 N.Y.S.2d 639, 134 N.E.2d 461; Note, 22 U. of Chi.L.Rev. 216, has resulted in a general judicial unanimity in supporting such prosecutions. There is a considerable body of additional precedents beyond those cited above, both in the Supreme Court of the United States and in other federal jurisdictions, of which various examples are given in the footnote.[3] It will not do to distinguish these cases as dicta or suggest that they have not considered modern problems. They are too many and too much of a piece to allow an intermediate court to make an inference of doubt in the circumstances. We can understand all the difficulties of censorship of

2. The injunction against sale of paper-covered booklets "indisputably pornographic, indisputably obscene and filthy"—the words are Judge Fuld's, 1 N.Y.2d 177, 151 N.Y.S.2d 639, 640, 134 N.E.2d 461, 462—was granted under a 1941 statute, N.Y. Code Cr.Proc. § 22–a, on suit of the Corporation Counsel of the City of New York. While the court was unanimous in holding the statute constitutional and the injunction proper, there were two opinions—a detailed analysis of the legal background by Judge Fuld, concurred in by two other judges, and a brief and more formal statement by Judge Desmond, concurred in by two other judges.

3. See, e. g., Ex parte Jackson, 96 U.S. 727, 24 L.Ed. 877; Swearingen v. United States, 161 U.S. 446, 16 S.Ct. 562, 40 L. Ed. 765; Dunlop v. United States, 165 U.S. 486, 17 S.Ct. 375, 41 L.Ed. 799; Public Clearing House v. Coyne, 194 U.S. 497, 508, 24 S.Ct. 789, 48 L.Ed. 1092; Robertson v. Baldwin, 165 U.S. 275, 281, 17 S.Ct. 326, 41 L.Ed. 715; Near v. State of Minnesota ex rel. Olson, 283 U.S. 697, 716, 51 S.Ct. 625, 75 L.Ed. 1357; Chaplinsky v. State of New Hampshire, 315 U.S. 568, 571–572, 62 S.Ct. 766, 86 L.Ed. 1031; Beauharnais v. People of State of Illinois, 343 U.S. 250, 266, 72 S.Ct. 725, 96 L.Ed. 919; Schindler v. United States, 9 Cir., 221 F.2d 743, certiorari denied 350 U.S. 938, 76 S.Ct. 310; United States v. Hornick, 3 Cir., 229 F.2d 120, affirming D.C.E.D.Pa., 131 F.Supp. 603; Roth v. Goldman, 2 Cir., 172 F.2d 788, certiorari denied 337 U.S. 938, 69 S. Ct. 1514, 93 L.Ed. 1743.

great literature, and indeed the various foolish excesses involved in the banning of notable books, without feeling justified in casting doubt upon all criminal prosecutions, both state and federal, of commercialized obscenity. A serious problem does arise when real literature is censored; but in this case no such issues should arise, since the record shows only salable pornography. But even if we had more freedom to follow an impulse to strike down such legislation in the premises, we should need to pause because of our own lack of knowledge of the social bearing of this problem, or consequences of such an act;[4] and we are hardly justified in rejecting out of hand the strongly held views of those with competence in the premises as to the very direct connection of this traffic with the development of juvenile delinquency.[5] We conclude, therefore, that the attack on constitutionality of this statute must here fail.

Defendant, however, takes special exception to the judge's treatment in his charge of the word "filthy," asserting that he opposed this term to the other parts of the statute, so as to render the statute vague and indefinite. What the judge said was this: " 'Filthy' as used here must also relate to sexual matters. It is distinguishable from the term 'obscene,' which tends to promote lust and impure thoughts. 'Filthy' pertains to that sort of treatment of sexual matters in such a vulgar and indecent way, so that it tends to arouse a feeling of disgust and revulsion." But this seems to us in line with long-standing judicial definitions of the term. The words "and every filthy" were inserted in the statute at the time of the enactment of the Penal Code in 1909. And in United States v. Limehouse, supra, 285 U.S. 424, 426, 52 S.Ct. 412, in 1932, Mr. Justice Brandeis for the Court pointed out the obvious intent to add "a new class of unmailable matter—the filthy." As he definitely pointed out, this plainly covered sexual matters; and the Court, so he said, had no occasion to consider whether filthy matter of a different character also fell within the prohibition. We do not see how this case can be read other than as support for the interpretation made by the court below and for the validity of the Act as interpreted. Moreover, earlier it had been ruled by the Sixth Cir-

4. See Fuld, J., in Brown v. Kingsley Books, Inc., 1 N.Y.2d 177, 151 N.Y.S.2d 639, 641, note 3, 134 N.E.2d 461, 463: "It is noteworthy that studies are for the first time being made, through such scientific skills as exist, concerning the impact of the obscene, in writings and other mass media, on the mind and behavior of men, women and children. (See, e. g., Jahoda and Staff of Research Center for Human Relations, New York University [1954], The Impact of Literature: A Psychological Discussion of Some Assumptions in the Censorship Debate.)"

5. Sen.Rep. No. 113, 84th Cong., 1st Sess., supporting the 1955 amendment to § 1461 discussed below, has this to say: "The subcommittee of the Committee on the Judiciary investigating juvenile delinquency in the United States reports that the nationwide traffic in obscene matter is increasing year by year and that a large part of that traffic is being channeled into the hands of children. That subcommittee recommended implementation of the present statute so as to prevent the using of the mails in the trafficking of all obscene matter. The passage of S. 600 will contribute greatly in the continuing struggle to combat juvenile delinquency and the corruption of public morals." 2 U.S.Code Cong. & Adm.News 1955, p. 2211.

See also Chief Justice Vanderbilt, Impasses in Justice, [1956] Wash.U.L.Q. 267, 302: "(4) Our greatest concern with the oncoming generation, I submit, relates to the perversion of young minds through the mass media of the movies, television, radio, and the press, especially so-called comics. Wertham, Seduction of the Innocent (1954). See also Feder, Comic Book Regulation (Univ. of Calif. Bureau of Pub. Admin. 1955). The problem is only beginning to receive the consideration its seriousness calls for. Here is a field in which the law schools are well equipped to furnish leadership in a controversy where rare discrimination and courage are required."

Perhaps scholarly research may suggest better statutes than we have; but it is doubtful if help can be found in such suggestions as for the inclusion in legislation of the enticing invitation, "For Adults Only." Cf. Ernst & Seagle, To the Pure 277 (1928).

cuit in Tyomies Pub. Co. v. United States, 6 Cir., 211 F. 385, 390, in 1914, that the trial judge properly submitted the issue to the jury as to whether or not a picture was filthy with the explanation: " 'By the term "filthy" is meant what it commonly or ordinarily signifies;' that which is nasty, dirty, vulgar, indecent, offensive to the moral sense, morally depraving and debasing.' " This is in substance what Judge Cashin charged here. See also United States v. Davidson, D.C.N.D.N.Y., 244 F. 523, 534, 535; Sunshine Book Co. v. Summerfield, D.C. D.C., 128 F.Supp. 564.

■■ Hence, having in mind Judge Hand's admonition in United States v. Kennerley, supra, D.C.S.D.N.Y., 209 F. 119, 121, that the jury must finally apply the standard thus indicated, we think there was nothing objectionable in the judge's instructions to the jury. Certainly, against this background, "filthy" is as clear and as easily understandable by the jury[6] as the terms "obscene" and "lewd" already committed to its care. Possibly some different nuances might have been given the term—though we are not sure what, nor are we given suggestions—but we cannot believe that the jury would have been helped. Nor did the defendant at the time find anything to question in the charge; his counsel, after the judge had granted all the specific additional requests he made, said that the judge had "fairly covered everything." Now he is not in a position to press this objection. Here we have more than a waiver by failure to object. We have in fact an instance of submission of issues to the jury on more than a single ground which might have been separated had the parties so desired. Since no request for separate verdicts or for withdrawal of this issue from the jury was made, the conviction must stand as supported by the clear evidence of obscenity. United States v. Mascuch, 2 Cir., 111 F. 2d 602, certiorari denied Mascuch v. United States, 311 U.S. 650, 61 S.Ct. 14, 85 L.Ed. 416; United States v. Smith,

2 Cir., 112 F.2d 83, 86; United States v. Goldstein, 2 Cir., 168 F.2d 666, 672; Claassen v. United States, 142 U.S. 140, 147, 12 S.Ct. 169, 35 L.Ed. 966; Stevens v. United States, 6 Cir., 206 F.2d 64, 66; Todorow v. United States, 9 Cir., 173 F. 2d 439, 445, certiorari denied 337 U.S. 925, 69 S.Ct. 1169, 93 L.Ed. 1733; United States v. Myers, D.C.N.D.Cal., 131 F. Supp. 525, 528. On either ground, therefore, this assignment of error must fail.

Our conclusion here settles the substantial issues on this appeal. As we have indicated, if the statute is to be upheld at all it must apply to a case of this kind where defendant is an old hand at publishing and surreptitiously mailing to those induced to order them such lurid pictures and material as he can find profitable. There was ample evidence for the jury, and the defendant had an unusual trial in that the judge allowed him to produce experts, including a psychologist who stated that he would find nothing obscene at the present time. Also various modern novels were submitted to the jury for the sake of comparison. Very likely the jury's moderate verdict on only a few of the many counts submitted by the government and supported by the testimony of those who had been led to send their orders through the mail was because of this wide scope given the defense. As the judge pointed out in imposing sentence, defendant has been convicted several times before under both state and federal law. Indeed this case and our discussions somewhat duplicate his earlier appearance in Roth v. Goldman, 2 Cir., 172 F.2d 788, certiorari denied 337 U.S. 938, 69 S.Ct. 1514, 93 L. Ed. 1743.

■■ Defendant claims error in entrapment because his advertisements were answered by government representatives. But this method of obtaining evidence was specifically approved in Rosen v. United States, supra, 161 U.S. 29, 42, 16 S.Ct. 434, 438, 480, and has been usual at least ever since. Ackley v. United States, 8 Cir., 200 F. 217, 222. In no

6. And by Judge Fuld and his colleagues; see supra note 2.

event was there any improper entrapment. See United States v. Masciale, 2 Cir., 236 F.2d 601. The government's summation in the case was within the scope of the evidence, and the court's charge was concise and correct. But one other matter needs to engage our attention. That was the defendant's claim of error in that the court charged with respect to the statute as it was at the time of the offenses, although it had been amended on June 28, 1955, or before the trial. But this amendment was designed to stiffen the Act and arose because in Alpers v. United States, 9 Cir., 175 F.2d 137, a conviction for mailing obscene phonograph records was reversed on the ground that such records were not clearly embodied in the statutory language quoted above. Although this decision was reversed and the conviction reinstated in United States v. Alpers, supra, 338 U.S. 680, 70 S.Ct. 352, the Congress was so anxious that there be no loophole that it enacted an amendment making unmailable now "[e]very obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance."[7] It would seem clear, therefore, that defendant has no ground of complaint because he was tried under the statute existing at the time of his offense; and in no event could he have been harmed.

Judgment affirmed.

FRANK, Circuit Judge (concurring).

The reference in Judge Clark's opinion to juvenile delinquency might lead the casual reader to suppose that, under the statute, the test of what constitutes obscenity is its effect on minors, and that the defendant, Roth, has been convicted for mailing obscene writings to (or for sale to) children. This court, however, in United States v. Levine, 2 Cir., 83 F.2d 156, has held that the correct test is the effect on the sexual thoughts and desires, not of the "young" or "immature," but of average, normal, adult persons. The trial judge here so instructed the jury.[1]

On the basis of that test, the jury could reasonably have found, beyond a reasonable doubt, that many of the books, periodicals, pamphlets and pictures which defendant mailed were obscene. Accordingly, I concur.[2]

7. It also eliminated the former fifth paragraph now superfluous. See the Senate Report cited supra note 5.

1. He said: "The test is not whether it would arouse sexual desires or sexually impure thoughts in those comprising a particular segment of the community, the young, the immature or the highly prudish. * * * In other words, you must determine its impact upon the average person in the community."

2. The statute condemns the mailing not only of "obscene" matter but also of "filthy" matter. Parts of the indictment here charged the defendant with mailing "filthy" publications. The trial judge told the jury they could convict the defendant for mailing a "filthy" publication, if they found that it treated "sexual matters in such a vulgar and indecent way so that it tends to arouse a feeling of disgust or aversion." The following contention might be urged:

The very argument advanced to sustain the statute's validity, so far as it condemns the obscene, goes to show the invalidity of the statute so far as it condemns "filth," if "filth" means that which renders sexual desires "disgusting." For if the argument be sound that the legislature may constitutionally provide punishment for the obscene because, antisocially, it arouses sexual desires by making sex attractive, then it follows that whatever makes sex disgusting is socially beneficial—and thus not the subject of valid legislation which punishes the mailing of "filthy" matter. To avoid this seeming inconsistency, the statute should be interpreted as follows: The mailing of a "filthy" matter is a crime if that matter tends to induce acts by the recipient which will probably tend to cause breaches of the peace. This interpretation is in line with United States v. Limehouse, 285 U.S. 424, 52 S.Ct. 412, 76 L.Ed. 843. There the Court affirmed the conviction of a defendant who had mailed letters to divers persons which, in "foul language," accused them of sexual immorality. Those letters thus were within the category of "fighting words"—i. e., insulting words or the like—which may constitutionally be made criminal precisely because they tend to provoke breaches of the peace. Where, however, "filthy" language appears in a book, or picture, and involves no insults

I do so although I have much difficulty in reconciling the validity of that statute with opinions of the Supreme Court, uttered within the past twenty-five years,[3] relative to the First Amendment as applied to other kinds of legislation. The doctrine expressed in those opinions, as I understand it, may be summarized briefly as follows: Any statute authorizing governmental interference (whether by "prior restraint" or punishment) with free speech or free press runs counter to the First Amendment, except when the government can show that the statute strikes at words which are likely to incite to a breach of the peace,[4] or with sufficient probability tend either to the overthrow of the government by illegal means or to some other overt anti-social conduct.[5]

The troublesome aspect of the federal obscenity statute—as I shall try to explain in the Appendix to this opinion—is that (a) no one can now show that, with any reasonable probability obscene publications tend to have any effects on the behavior of normal, average adults, and (b) that under that statute, as judicially interpreted, punishment is apparently inflicted for provoking, in such adults, undesirable sexual thoughts, feelings, or desires—not overt dangerous or anti-social conduct, either actual or probable.

Often the discussion of First Amendment exceptions has been couched in terms of a " 'clear and present danger' ". However, the meaning of that phrase has been somewhat watered down by Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 865, 95 L.Ed. 1137. The test now involves probability: " 'In each case (courts) must ask' ", said Chief Justice Vinson in Dennis, " 'whether the gravity of the "evil," discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.' " It has been suggested that the test now is this: "The more serious and threatened the evil, the lower the required degree of probability."[6] It would seem to follow that the less clear the danger, the more imminent must it be. At any rate, it would seem that (1) the danger or evil must be clear (i. e., identifiable) and substantial, and (2) that, since the statute renders words punishable, it is invalid unless those words tend, with a fairly high degree of probability, to incite to overt conduct which is obviously harmful. For, under the First Amendment, lawless or anti-social "acts are the main thing. Speech is not punishable for its own sake, but only because of its connection with those * * * acts * * * But more than a remote connection is necessary * * *"[7] See, e. g., American Communications Ass'n, C.I.O. v. Douds, 339 U.S. 382, 398, 70 S. Ct. 674, 683, 94 L.Ed. 925, as to "the right of the public to be protected from evils of conduct, even though the First

to particular persons, there will be no such consequences.

If this were the correct interpretation of "filthy," then that part of the statute condemning the "filthy" would not apply to the acts of the defendant here, and the judge's instructions re "filthy" would have been erroneous.

But I think we need not here consider that interpretation since I agree with my colleagues that, for the reasons they state, assuming there was error, the defendant's deliberate acquiescence in the judge's instructions prevents him from now so asserting.

3. "For nearly 130 years after its adoption, the First Amendment received scant attention from the 'Supreme Court"; Emerson, The Doctrine of Prior Re-

straint, 20 L. & Cont.Problems (1955) 648, 652.

4. See, e. g., Chaplinsky v. State of New Hampshire, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031.

5. The judicial enforcement of some private rights—as in suits, e. g., for defamation, injury to business, fraud, or invasion of privacy—comes within the exception.

6. Lockhart and McClure, Obscenity and the Constitution, 38 Minn.L.Rev. (1954) 295, 357; cf. Kalven, The Law of Defamation and the First Amendment, in (University of Chicago) Conference on the Arts, Publishing and the Law (1952) 3, 12.

7. Chafee, The Blessings of Liberty (1956) 69.

Amendment rights of persons or groups are thereby in some manner infringed". (Emphasis added.)

As I read the Supreme Court's opinions, the government, in defending the constitutionality of a statute which curbs free expression, may not rely on the usual "presumption of validity." No matter how one may articulate the reasoning, it is now accepted doctrine that, when legislation affects free speech or free press, the government must show that the legislation comes within one of the exceptions described above. See, e. g., Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; Joseph Burstyn, Inc., v. Wilson, 343 U.S. 495, 503, 72 S.Ct. 777, 96 L.Ed. 1098. Moreover, when legislation affects free expression, the void-for-vagueness doctrine has a peculiar importance; and the obscenity statute is exquisitely vague. (See the Appendix, point 9.)

True, the Supreme Court has said several times that the federal obscenity statute (or any such state statute) is constitutional. But the Court has not directly so decided; it has done so *sub silentio* in applying the federal statute, or has referred to the constitutionality of such legislation in dicta. The Court has not thoroughly canvassed the problem in any opinion, nor applied to it the doctrine (summarized above) concerning the First Amendment which the Court has evolved in recent years. I base that statement on the following analysis of the cases:

In Ex parte Jackson, 1877, 96 U.S. 727, 24 L.Ed. 877, the Court held valid a statute relating to the mailing of letters, or circulars, concerning lotteries. Such letters or circulars might well induce the addressees to engage in the overt conduct of engaging in lotteries. The Court, only in passing, referred to the obscenity statute and said it, too, was valid.

In Rosen v. United States, 1896, 161 U.S. 29, 16 S.Ct. 434, 480, 40 L.Ed. 606, the issue was solely the sufficiency of an indictment under the obscenity statute, not the validity of that legislation, and the Court did not discuss its validity.

In Swearingen v. United States, 1896, 161 U.S. 446, 16 S.Ct. 562, 40 L.Ed. 765, the Court reversed a conviction under the obscenity statute; it did not consider its constitutionality.

Dunlop v. United States, 1896, 165 U.S. 486, at page 501, 17 S.Ct. 375, at page 380, 41 L.Ed. 799, did not discuss the constitutionality of the statute; moreover, the opinion shows that it dealt with advertisements soliciting improper sexual relations, i. e., with probable conduct, not with mere thoughts or desires.

In Public Clearing House v. Coyne, 1904, 194 U.S. 497, at page 508, 24 S.Ct. 789, at page 793, 48 L.Ed. 1092, which did not involve the validity of the obscenity Act, the Court said in passing that its constitutionality "has never been attacked."

In United States v. Limehouse, 1932, 285 U.S. 424, 52 S.Ct. 412, 76 L.Ed. 843, the Court decided the correct interpretation of the word "filthy" in the statute, and did not consider the question of constitutionality. Moreover, there the defendant had mailed letters attacking the characters of the recipients who might well have been moved to conduct in breach of the peace.

In Winters v. People of State of New York, 1948, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840, the Court held void for vagueness a state statute making it a crime to distribute publications consisting principally of news or stories of criminal deeds of bloodshed or lust so massed as to become vehicles for inciting violent and depraved crimes. The Court said in passing, 333 U.S. at page 510, 68 S.Ct. at page 667, that legislation subjecting obscene publications to governmental control is valid.

In Doubleday & Co. v. People of State of New York, 1948, 335 U.S. 848, 69 S.Ct. 79, 93 L.Ed. 398, the Court, by an evenly divided vote, without opinion affirmed a state court decision sustaining a state obscenity statute.

In United States v. Alpers, 1950, 338 U.S. 680, 70 S.Ct. 352, 94 L.Ed. 457, the Court construed the statute as amended,

and affirmed a conviction thereunder, but did not consider its constitutionality.

In the following cases, where the validity of no obscenity statute was involved, the Court, in passing, referred to such legislation as valid: Robertson v. Baldwin, 1897, 165 U.S. 275, 281, 17 S.Ct. 326, 41 L.Ed. 715; Near v. State of Minnesota, 1931, 283 U.S. 697, 716, 51 S. Ct. 625, 75 L.Ed. 1357; Lovell v. City of Griffin, 1938, 303 U.S. 444, 451, 58 S.Ct. 666, 82 L.Ed. 949; Chaplinsky v. State of New Hampshire, 1942, 315 U.S. 568, 571–572, 62 S.Ct. 766, 86 L.Ed. 1031; Beauharnais v. People of State of Illinois, 1952, 343 U.S. 250, 266, 72 S.Ct. 725, 96 L.Ed. 919.

I agree with my colleagues that, since ours is an inferior court, we should not hold invalid a statute which our superior has thus often said is constitutional (albeit without any full discussion). Yet I think it not improper to set forth, as I do in the Appendix, considerations concerning the obscenity statute's validity with which, up to now, I think the Supreme Court has not dealt in any of its opinions. I do not suggest the inevitability of the conclusion that that statute is unconstitutional. I do suggest that it is hard to avoid that conclusion, if one applies to that legislation the reasoning the Supreme Court has applied to other sorts of legislation. Perhaps I have overlooked conceivable compelling contrary arguments. If so, maybe my Appendix will evoke them.

To preclude misunderstanding of my purpose in stirring doubts about this statute, I think it well to add the following:

(a) As many of the publications mailed by defendant offend my personal taste, I would not cross a street to obtain them for nothing; I happen not to be interested in so-called "pornography"; and I think defendant's motives obnoxious. But if the statute were invalid, the merit of those publications would be irrelevant. Winters v. People of State of New York, 333 U.S. 507, 510, 68 S.Ct. 665, 92 L.Ed. 840. So, too, as to defendant's motives: "Although the defendant may be the worst of men * * * the rights of the best of men are secure only as the rights of the vilest and most abhorrent are protected."[8]

(b) It is most doubtful (as explained in the Appendix) whether anyone can now demonstrate that children's reading or looking at obscene matter has a probable causal relation to the children's anti-social conduct.[9] If, however, such a probable causal relation could be shown, there could be little doubt, I think, of the validity of a statute (if so worded as to avoid undue ambiguity) which specifically prohibits the distribution by mail of obscene publications for sale to young people. But discussion of such legislation is here irrelevant, since, to repeat, the existing federal statute is not thus restricted.

(c) Congress undoubtedly has wide power to protect public morals. But the First Amendment severely limits that power in the area of free speech and free press.

(d) It is argued that anti-obscenity legislation is valid because, at the time of the adoption of the First Amendment, obscenity was a common law crime. Relying (*inter alia*) on Bridges v. State of California, 314 U.S. 252, 264–265, 62 S. Ct. 190, 86 L.Ed. 192 and Grosjean v. American Press Co., 297 U.S. 233, 248–249, 56 S.Ct. 444, 80 L.Ed. 660, I have tried in the Appendix to answer that argument.

---

8. Judge Cuthbert Pound dissenting in People v. Gitlow, 234 N.Y. 132, 158, 136 N.E. 317, 327.

9. The Appendix contains a discussion of the writings of those described by Judge Clark as persons "with competence in the premises". It tries to show (1) that the overwhelming majority of persons with such competence assert that there is no justification for the thesis that a demonstrable causal relation exists between reading or seeing the obscene and anti-social conduct, even of children, and (2) that the chief proponent of the opposite view with respect to the effect on children's conduct does not maintain the same as to adult conduct.

(e) The First Amendment, of course, does not prevent any private body or group (including any Church) from instructing, or seeking to persuade, its adherents or others not to read or distribute obscene (or other) publications. That constitutional provision—safeguarding a principle indispensable in a true democracy—leaves unhampered all non-governmental means of molding public opinion about not reading literature which some think undesirable; and, in that respect, experience teaches that democratically exercised censorship by public opinion has far more potency, and is far less easily evaded, than censorship by government.[10] The incessant struggle to influence public opinion is of the very essence of the democratic process. A basic purpose of the First Amendment is to keep that struggle alive, by not permitting the dominant public opinion of the present to become embodied in legislation which will prevent the formation of a different dominant public opinion in the future.[11]

(f) At first glance it may seem almost frivolous to raise any question about the constitutionality of the obscenity statute at a time when many seemingly graver First Amendment problems confront the courts. But (for reasons stated in more detail in the Appendix) governmental censorship of writings, merely because they may stimulate, in the reader, sexual thoughts the legislature deems undesirable, has more serious implications than appear at first glance: We have been warned by eminent thinkers of the easy path from any apparently mild governmental control of what adult citizens may read to governmental control of adult's political and religious reading. John Milton, Thomas Jefferson, James Madi-

son, J. S. Mill and Tocqueville have pointed out that any paternalistic guardianship by government of the thoughts of grown-up citizens enervates their spirit, keeps them immature, all too ready to adopt towards government officers the attitude that, in general, "Papa knows best." If the government possesses the power to censor publications which arouse sexual thoughts, regardless of whether those thoughts tend probably to transform themselves into anti-social behavior, why may not the government censor political and religious publications regardless of any causal relation to probable dangerous deeds? And even if we confine attention to official censorship of publications tending to stimulate sexual thoughts, it should be asked why, at any moment, that censorship cannot be extended to advertisements and true reports or photographs, in our daily press, which, fully as much, may stimulate such thoughts?

(g) Assuming, *arguendo*, that a statute aims at an altogether desirable end, nevertheless its desirability does not render it constitutional. As the Supreme Court has said, "The good sought in unconstitutional legislation is an insidious feature, because it leads citizens and legislatures of good purpose to promote it without thought of the serious break it will make in the ark of our covenant. * * * "[12]

In a concurring opinion in Roth v. Goldman, 2 Cir., 1948, 172 F.2d 788, 790, I voiced puzzlement about the constitutionality of administrative prior restraint of obscene books. I then had little doubt about the validity of a purely punitive obscenity statute. But the next year, in Commonwealth v. Gordon, 1949, 66 Pa.Dist. & Co. R. 101, Judge Curtis

---

10. Public opinion, by influencing social attitudes, may create a convention, with no governmental "sanction" behind it, far more coercive than any statute. Cf. Holmes, Codes and The Arrangement of the Law, 2 Am.L.Rev. (1870) 4, 5.

Notably is this true of conventions as to obscenity; La Barre, Obscenity: An Anthropological Appraisal, 20 L. & Con. Problems (1955) 533.

11. The results of the pressure of current public opinion may not always be happy. But our democracy accepts the postulate that, in the long run, the struggle to sway public opinion will produce the wisest policies. For further discussion of this theme, see the Appendix.

12. The Child Labor Tax Case, Bailey v. Drexel Furniture Co., 259 U.S. 20, 37, 42 S.Ct. 449, 450, 66 L.Ed. 817.

Bok, one of America's most reflective judges, directly attacked the validity of any such punitive legislation. His brilliant opinion, which states arguments that (so far as I know) have never been answered, nudged me into the skeptical views contained in this opinion and the Appendix.

### Appendix

As a judge of an inferior court, I am constrained by opinions of the Supreme Court concerning the obscenity statute to hold that legislation valid. Since, however, I think (as indicated in the foregoing) that none of those opinions has carefully canvassed the problem in the light of the Supreme Court's interpretation of the First Amendment, especially as expressed by the Court in recent years, I deem it not improper to set forth, in the following, factors which I think deserve consideration in passing on the constitutionality of that statute.

1. Benjamin Franklin, in 1776 unanimously designated Postmaster General by the First Continental Congress, is appropriately known as the "father of the Post Office." Among his published writings are two[1]—*Letter of Advice to Young Men on the Proper Choosing of a Mistress* and *The Speech of Polly Baker* —which a jury could reasonably find "obscene," according to the judge's instructions in the case at bar. On that basis, if tomorrow a man were to send those works of Franklin through the mails, he would be subject to prosecution and (if the jury found him guilty) to punishment under the federal obscenity statute.[2]

That fact would surely have astonished Jefferson, who extolled Franklin as an American genius,[3] called him "venerable and beloved" of his countrymen,[4] and wrote approvingly of Franklin's *Polly Baker*.[5] No less would it have astonished Madison, also an admirer of Franklin (whom he described as a man whose "genius" was "an ornament of human nature")[5a] and himself given to telling "Rabelaisian anecdotes."[6] Nor was the taste of these men unique in the American Colonies: "Many a library of a colonial planter in Virginia or a colonial intellectual in New England boasted copies of Tom Jones, Tristram Shandy, Ovid's Art of Love, and Rabelais. * * *"[7]

---

1. See Van Doren, Benjamin Franklin (1938) 150–151, 153–154.

   Franklin's *Letter to The Academy of Brussells* (see Van Doren, 151–152) might be considered "filthy."

2. 18 U.S.C. § 1461.

3. Jefferson, Notes on the State of Virginia 1781–1785), Query VI; See Padover, The Complete Jefferson (1943) 567 at 612.

4. Jefferson, Autobiography (1821); See Padover, loc. cit., 1119 at 1193.

5. Jefferson, Anecdotes of Franklin (1818); see Padover, loc. cit., 892 at 893.

5a. On Franklin's death, Madison offered the following resolution which the House of Representatives unanimously adopted: "The House being informed of the decease of Benjamin Franklin, a citizen whose genius was not more of an ornament of human nature than his various exertions of it have been to science, to freedom and to his country, do resolve, as a mark of veneration due to his memory, that the members wear the customary badge of mourning for one month."

   Brant, James Madison, Father of the Constitution (1950) 309; Annals, April 22, 1790.

6. Padover, The Complete Madison (1953) 8–9.

   George Washington, who knew Franklin well, treasured a gold-headed cane given him by Franklin. See Padover, The Washington Papers (1955) 112.

   See Judge Bok, in Commonwealth v. Gordon, 66 Pa.Dist. & Co. R. 101, 120–121: "One need only recall that the father of the post office, Benjamin Franklin, wrote and presumably mailed his letter of Advice to Young Men on the Proper Choosing of a Mistress; * * * that Alexander Hamilton's adultery while holding public office created no great scandal * * *"

7. Ernst and Seagle, To The Pure (1928) 108.

   Everyone interested in obscenity legislation owes a deep debt to many writings on the subject by Morris Ernst. For such an acknowledgment, see Acknowledgments in Blanshard, The Right to Read (1955).

As, with Jefferson's encouragement, Madison, in the first session of Congress, introduced what became the First Amendment, it seems doubtful that the constitutional guaranty of free speech and free press could have been intended to allow Congress validity to enact the "obscenity" Act. That doubt receives reinforcement from the following:

In 1799, eight years after the adoption of the First Amendment, Madison, in an Address to the General Assembly of Virginia,[8] said that the "truth of opinion" ought not to be subject to "imprisonment, to be inflicted by those of a different opinion"; he there also asserted that it would subvert the First Amendment [9] to make a "distinction between the freedom and the licentiousness of the press." Previously, in 1792, he wrote that "a man has property in his opinions and free communication of them," and that a government which "violates the property which individuals have in their opinion * * * is not a pattern for the United States."[10] Jefferson's proposed Constitution for Virginia (1776), provided: "Printing presses shall be free, except so far as by commission of private injury cause may be given of private action."[11] In his Second Inaugural Address (1805), he said: "No inference is here intended that the laws provided by the State against false and defamatory publications should not be enforced * * * The press, confined to truth, needs no other restraint * * *; and no other definite line can be drawn between the inestimable liberty of the press and demoralizing licentiousness. If there still be improprieties which this rule would not restrain, its supplement must be sought in the censorship of public opinion."

The broad phrase in the First Amendment, prohibiting legislation abridging "freedom of speech, or of the press", includes the right to speak and write freely for the public concerning any subject. As the Amendment specifically refers to "the free exercise [of religion]" and to the right "of the people * * * to assemble" and to "petition the Government for a redress of grievances", it specifically includes the right freely to speak to and write for the public concerning government and religion; but it does not limit this right to those topics. Accordingly, the views of Jefferson and Madison about the freedom to speak and write concerning religion are relevant to a consideration of the constitutional freedom in respect of all other subjects. Consider, then, what those men said about freedom of religious discussion: Madison, in 1799, denouncing the distinction "between the freedom and the licentiousness of the press" said, "By its help, the judge as to what is licentious may escape through any constitutional restriction," and added, "Under it, Congress might denominate a religion to be heretical and licentious, and proceed to its suppression * * * Remember * * * that it is to the press mankind are indebted for having dispelled the clouds which long encompassed religion * * *"[12] Jefferson, in 1798, quoting the First Amendment, said it guarded "in the same sentence, and under the same words, the freedom of religion, of speech, and of the press; insomuch, that whatever violates either, throws down the sanctuary which covers the others."[13] In 1814, he wrote in a letter, "I am really mortified to be told that in the United States of America, a fact like this (the sale of a book) can become a subject of inquiry, and of criminal inquiry too, as an offense against religion; that (such) a question can be carried before the civil magistrate. Is

---

8. See Padover, The Complete Madison (1953) 295–296.

9. Madison referred to the "Third Amendment," but the context shows he meant the First.

10. See Padover, The Complete Madison (1953) 267, 268–269.

11. Padover, The Complete Jefferson (1943) 109.

12. Madison, Address to the General Assembly of Virginia, 1799; see Padover, The Complete Madison (1953) 295.

13. See Padover, The Complete Jefferson (1943) 130.

this then our freedom of religion? And are we to have a censor whose imprimatur shall say what books may be sold and what we may buy? * * * Whose foot is to be the measure to which ours are all to be cut or stretched?"[14]

Those utterances high-light this fact: Freedom to speak publicly and to publish has, as its inevitable and important correlative, the private rights to hear, to read, and to think and to feel about what one hears and reads. The First Amendment protects those private rights of hearers and readers.

We should not forget that, prompted by Jefferson,[15] Madison (who at one time had doubted the wisdom of a Bill of Rights)[16] when he urged in Congress the enactment of what became the first ten Amendments, declared, "If they are incorporated into the Constitution, independent tribunals of justice will consider themselves in a peculiar manner the guardian of those rights; they will be an impenetrable barrier against every assumption of power in the Legislative or Executive; they will be naturally led to resist every encroachment upon rights expressly stipulated for in the Constitution by the declaration of rights."[17] In short, the Bill of Rights, including the First Amendment, was not designed merely as a set of admonitions to the legislature and the executive; its provisions were to be enforced by the courts.

Judicial enforcement necessarily entails judicial interpretation. The question therefore arises whether the courts, in enforcing the First Amendment, should interpret it in accord with the views prevalent among those who sponsored and adopted it or in accord with subsequently developed views which would sanction legislation more restrictive of free speech and free press.

So the following becomes pertinent: Some of those who in the 20th Century endorse legislation suppressing "obscene" literature have an attitude towards freedom of expression which does not match that of the framers of the First Amendment (adopted at the end of the 18th Century) but does stem from an attitude, towards writings dealing with sex, which arose decades later, in the mid-19th Century, and is therefore labelled—doubtless too sweepingly—"Victorian." It was a dogma of "Victorian morality" that sexual misbehavior would be encouraged if one were to "acknowledge its existence or at any rate to present it vividly enough to form a life-like image of it in the reader's mind"; this morality rested on a "faith that you could best conquer evil by shutting your eyes to its existence,"[18] and on a kind of word magic.[19] The demands at that time for "decency" in published words did not comport with the actual sexual conduct of many of those who made those demands: "The Victorians, as a general rule, managed to conceal the 'coarser' side of their lives so thoroughly under a mask of respectability that we often fail to realize how 'coarse' it really was * * * Could we have recourse to the vast unwritten literature of bawdry, we should be able to form a more veracious notion of life as it (then) really was." The respectables of those days often, "with unblush-

14. See Padover, The Complete Jefferson (1943) 889.

15. Jefferson's Letter to Madison (1789); Padover, The Complete Jefferson (1943) 123–125. See also Brant, James Madison, Father of the Constitution (1950) 267.

16. The Federalist No. 84; Cahn, The Firstness of the First Amendment, 65 Yale L.J. (1956) 464.

17. Madison, Writings (Hunt ed.) V, 385; Corwin, Liberty Against Government (1948) 58–59; Cahn, The Firstness of the First Amendment, 64 Yale L.J. (1956) 464, 468.

18. Wingfield-Stratford, Those Earnest Victorians (1930) 151.

19. See Kaplan, Obscenity as an Esthetic Category, 20 Law & Contemp. Problems (1955) 544, 550: "In many cultures, obscenity has an important part in magical rituals. In our own, its magical character is betrayed in the puritan's supposition that words alone can work evil, and that evil will be averted if only the words are not uttered."

ing license," held "high revels" in "night houses."[20] Thanks to them, Mrs. Warren's profession flourished, but it was considered sinful to talk about it in books.[21] Such a prudish and purely verbal moral code, at odds (more or less hypocritically) with the actual conduct of its adherents [22] was (as we have seen) not the moral code of those who framed the First Amendment.[23] One would suppose, then, that the courts should interpret and enforce that Amendment according to the views of those framers, not according to the later "Victorian" code.[24]

### The "founding fathers" did not accept the common law concerning freedom of expression

It has been argued that the federal obscenity statute is valid because obscenity was a common law crime at the time of the adoption of the First Amendment. Quite aside from the fact that, previous to the Amendment, there had been scant recognition of this crime, the short answer seems to be that the framers of the Amendment knowingly and deliberately intended to depart from the English common law as to freedom of speech and freedom of the press. See Grosjean v. American Press Co., 297 U. S. 233, 248–249, 56 S.Ct. 444, 80 L.Ed. 660; Bridges v. State of California, 314 U.S. 252, 264–265, 62 S.Ct. 190, 86 L.Ed. 192;[24a] Patterson, Free Speech and a Free Press (1939) 101–102, 124–125, 128; Schofield, 2 Constitutional Law and Equity (1921) 521–525.

Of course, the legislature has wide power to protect what it considers public

20. Wingfield-Stratford, loc. cit., 296–297.

21. Paradoxically, this attitude apparently tends to "create" obscenity. For the foundation of obscenity seems to be secrecy and shame: "The secret becomes shameful because of its secrecy." Kaplan, Obscenity As An Esthetic Category, 20 Law & Contemp. Problems (1955) 544, 556.

22. To be sure, every society has "pretend-rules" (moral and legal) which it publicly voices but does not enforce. Indeed, a gap necessarily exists between a society's ideals, if at all exalted, and its practices. But the extent of the gap is significant. See, e. g., Frank, Lawlessness. Encyc. of Soc. Sciences (1932); cf. Frank, Preface to Kahn, A Court for Children (1953).

23. It is of interest that not until the Tariff Act of 1824 did Congress enact any legislation relative to obscenity.

24. For discussion of the suggestion that many constitutional provisions provide merely minimum safeguards which may properly be enlarged—not diminished—to meet newly emerging needs and policies, see Supreme Court and Supreme Law (Cahn ed. 1954) 59–64.

24a. In Bridges v. State of California, 314 U.S. 252, 264–265, 62 S.Ct. 190, 194, the Court said: "In any event it need not detain us, for to assume that English common law in this field became ours is to deny the generally accepted historical belief that 'one of the objects of the Revolution was to get rid of the English common law on liberty of speech and of the press.' Schofield, Freedom of the Press in the United States, 9 Publications Amer.Sociol.Soc., 67, 76. More specifically, it is to forget the environment in which the First Amendment was ratified. In presenting the proposals which were later embodied in the Bill of Rights, James Madison, the leader in the preparation of the First Amendment said: 'Although I know whenever the great rights, the trial by jury, freedom of the press, or liberty of conscience, come in question in that body (Parliament), the invasion of them is resisted by able advocates, yet their Magna Charta does not contain any one provision for the security of those rights, respecting which the people of America are most alarmed. The freedom of the press and rights of conscience, those choicest privileges of the people, are unguarded in the British Constitution.' 1 Annals of Congress 1789–1790, 434. And Madison elsewhere wrote that 'the state of the press * * * under the common law, cannot * * * be the standard of its freedom in the United States.' VI Writings of James Madison 1790–1802, 387. There are no contrary implications in any part of the history of the period in which the First Amendment was framed and adopted. No purpose in ratifying the Bill of Rights was clearer than that of securing for the people of the United States much greater freedom of religion, expression, assembly, and petition than the people of Great Britain had ever enjoyed. It cannot be denied, for example, that the religious test oath or the restrictions upon

morals. But the First Amendment severely circumscribes that power (and all other legislative powers) in the area of speech and free press.

*Subsequent punishment as, practically, prior restraint*

For a long time, much was made of the distinction between a statute calling for "prior restraint" and one providing subsequent criminal punishment;[25] the former alone, it was once said, raised any question of constitutionality vis-à-vis the First Amendment.[26] Although it may still be true that more is required to justify legislation providing "preventive" than "punitive" censorship,[27] this distinction has been substantially eroded. See, e. g., Dennis v. United States, 341 U. S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; Schenck v. United States, 249 U.S. 47, 39 S.Ct. 247, 63 L.Ed. 470; De Jonge v. State of Oregon, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278; Thornhill v. State of Alabama, 310 U.S. 88, 97–98, 60 S.Ct.

assembly then prevalent in England would have been regarded as measures which the Constitution prohibited the American Congress from passing. And since the same unequivocal language is used with respect to freedom of the press, it signifies a similar enlargement of that concept as well. Ratified as it was while the memory of many oppressive English restrictions on the enumerated liberties was still fresh, the First Amendment cannot reasonably be taken as approving prevalent English Practices. On the contrary, the only conclusion supported by history is that the unqualified prohibitions laid down by the framers were intended to give to liberty of the press, as to the other liberties, the broadest scope that could be countenanced in an orderly society."

In Grosjean v. American Press Co., 297 U.S. 233, 248–249, 56 S.Ct. 444, 448, 80 L.Ed. 660, the Court said: "It is impossible to concede that by the words 'freedom of the press' the framers of the amendment intended to adopt merely the narrow view then reflected by the law of England that such freedom consisted only in immunity from previous censorship; for this abuse had then permanently disappeared from English practice. * * * Undoubtedly, the range of a constitutional provision phrased in terms of the common law sometimes may be fixed by recourse to the applicable rules of that law. But the doctrine which justifies such recourse, like other canons of construction, must yield to more compelling reasons whenever they exist. Cf. Continental Illinois Nat. Bank & Trust Co. of Chicago v. Chicago, R. I. & P. Ry. Co., 294 U.S. 648, 668–669, 55 S.Ct. 595, 79 L.Ed. 1110. And, obviously, it is subject to the qualification that the common-law rule invoked shall be one not rejected by our ancestors as unsuited to their civil or political conditions. Den ex rel. Murray's Lessee v. Hoboken Land & Improvement Co., 18 How. 272, 276–277, 15 L.Ed. 372; Waring

v. Clarke, 5 How. 441, 454–457, 12 L.Ed. 226; Powell v. State of Alabama, supra, 287 U.S. 45, at pages 60–65, 53 S.Ct. 55, 77 L.Ed. 158. In the light of all that has now been said, it is evident that the restricted rules of the English law in respect of the freedom of the press in force when the Constitution was adopted were never accepted by the American colonists * * *."

25. Blackstone, most influentially, made this distinction; 4 Blackstone, Commentary, 151–162. His condonation of punishment reflected the views of his patron, Lord Mansfield, who, an opponent of a free press, took an active part in punishing published criticism of the government.

But men like Jefferson and James Wilson abhorred the Tory political views of Blackstone and Mansfield, both of whom had ranked high in the opposition to the American Colonists. Jefferson wrote to Madison of "the horrid Mansfieldism of Blackstone which had caused many young American lawyers to slide into Toryism." Jefferson applauded Tucker's "republicanized" edition of Blackstone published in 1803. See Frank, A Sketch of An Influence, in the volume Interpretations of Modern Legal Philosophers (1947) 189, especially 231; see also 191, 196–198, 205, 207, 210, 215–217. For James Wilson's denunciation of Blackstone's political attitudes, see, e. g., Wilson's opinion in Chisholm v. State of Georgia, 2 Dall. 419, 453, 458, 462, 1 L.Ed. 440.

26. See Holmes, J. in Patterson v. State of Colorado, 1907, 205 U.S. 454, 27 S.Ct. 556, 51 L.Ed. 879 citing Blackstone. But compare his subsequent dissenting opinion in Abrams v. United States, 1919, 250 U.S. 616, 624, 40 S.Ct. 17, 20, 63 L. Ed. 1173, which abandons Blackstone's dichotomy.

27. For these phrases, see Lasswell, Censorship, 3 Ency. of Soc. Sc. (1930) 290, 291.

736, 84 L.Ed. 1093; Chaplinsky v. State of New Hampshire, 315 U.S. 568, 572, Note 3, 62 S.Ct. 766, 86 L.Ed. 1031. See also Hale, Freedom Through Law (1952) 257–265; Emerson, The Doctrine of Prior Restraint, 20 Law & Contemp. Problems (1955) 648 (a thought-stirring discussion of the problem); Kalven, loc. cit. at 8–10, 13. (For further discussion of this theme, see infra.)

*The statute, as judicially interpreted, authorizes punishment for inducing mere thoughts, and feelings, or desires*

For a time, American courts adopted the test of obscenity contrived in 1868 by Cockburn, L.J., in Queen v. Hicklin, L.R. 3 Q.B. 360: "I think the test of obscenity is this, whether the tendency of the matter charged as obscenity is to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publication of this sort might fall." He added that the book there in question "would suggest * * thoughts of a most impure and libidinous character."

The test in most federal courts has changed: They do not now speak of the thoughts of "those whose minds are open to * * * immoral influences" but, instead, of the thoughts of average adult normal men and women, determining what these thoughts are, not by proof at the trial, but by the standard of "the average conscience of the time," the current "social sense of what is right." See, e. g., United States v. Kennerley, D.C., 209 F. 119, 121; United States v. Levine,

2 Cir., 83 F.2d 156, 157; Parmelee v. United States, 72 App.D.C. 203, 113 F.2d 729. Yet the courts still define obscenity in terms of the assumed average normal adult reader's sexual thoughts or desires or impulses, without reference to any relation between those "subjective" reactions and his subsequent conduct. The judicial opinions use such key phrases as this: "suggesting lewd thoughts and exciting sensual desires;"[28] "arouse the salacity of the reader,"[29] "'allowing or implanting * * * obscene, lewd, or lascivious thoughts or desires'",[30] "arouse sexual desires".[30a] The judge's charge in the instant case reads accordingly: "It must tend to stir sexual impulses and lead to sexually impure thoughts." Thus the statute, as the courts construe it, appears to provide criminal punishment for inducing no more than thoughts, feelings, desires.

*No adequate knowledge is available concerning the effects on the conduct of normal adults of reading or seeing the "obscene"*

Suppose we assume, *arguendo*, that sexual thoughts or feelings, stirred by the "obscene," probably will often issue into overt conduct. Still it does not at all follow that that conduct will be anti-social. For no sane person can believe it socially harmful if sexual desires lead to normal, and not anti-social, sexual behavior since, without such behavior, the human race would soon disappear.[31]

Doubtless, Congress could validly provide punishment for mailing any publications if there were some moderately

---

28. United States v. Dennett, 2 Cir., 39 F. 2d 564, 568, 76 A.L.R. 1092.

29. United States v. Levine, 2 Cir., 83 F.2d 156, 158.

30. Burstein v. United States, 2 Cir., 178 F.2d 665, 667.

30a. American Civil Liberties Union v. City of Chicago, 3 Ill.2d 334, 121 N.E.2d 585, 592.

31. Cf. the opinion of Mr. Justice Codd in Integrated Press v. The Postmaster General, as reported in Herbert, Codd's Last Case (1952) 14, 16: "Nor is the Court much impressed by the contention that the frequent contemplation of young ladies in bathing dresses must tend to the moral corruption of the community. On the contrary, these ubiquitous exhibitions have so diminished what was left of the mystery of womanhood that they might easily be condemned upon another ground of public policy, in that they tended to destroy the natural fascination of the female, so that the attention of the male population was diverted from thoughts of marriage to cricket, darts, motor-bicycling and other occupations which do nothing to arrest the decline of the population."

substantial reliable data showing that reading or seeing those publications probably conduces to seriously harmful sexual conduct on the part of normal adult human beings. But we have no such data.

Suppose it argued that whatever excites sexual longings might *possibly* produce sexual misconduct. That cannot suffice: Notoriously, perfumes sometimes act as aphrodisiacs, yet no one will suggest that therefore Congress may constitutionally legislate punishment for mailing perfumes. It may be that among the stimuli to irregular sexual conduct, by *normal men and women*, may be almost anything—the odor of carnations or cheese, the sight of a cane or a candle or a shoe, the touch of silk or a gunnysack. For all anyone now knows, stimuli of that sort may be far more provocative of such misconduct than reading obscene books or seeing obscene pictures. Said John Milton, "Evil manners are as perfectly learnt, without books, a thousand other ways that cannot be stopped."

### Effect of "obscenity" on adult conduct

To date there exist, I think, no thorough-going studies by competent persons which justify the conclusion that normal adults' reading or seeing of the "obscene" probably induces anti-social conduct. Such competent studies as have been made do conclude that so complex and numerous are the causes of sexual vice that it is impossible to assert with any assurance that "obscenity" represents a ponderable causal factor in sexually deviant adult behavior. "Although the whole subject of obscenity censorship hinges upon the unproved assumption that 'obscene' literature is a significant factor in causing sexual deviation from the community standard, no report can be found of a single effort at genuine research to test this assumption by singling out as a factor for study the effect of sex literature upon sexual behavior."[32] What little competent research has been done,

points definitely in a direction precisely opposite to that assumption.

Alpert reports [33] that, when, in the 1920s, 409 women college graduates were asked to state in writing what things stimulated them sexually, they answered thus: 218 said "Man"; 95 said books; 40 said drama; 29 said dancing; 18 said pictures; 9 said music. Of those who replied "that the source of their sex information came from books, not one specified a 'dirty' book as the source. Instead, the books listed were: The Bible, the dictionary, the encyclopedia, novels from Dickens to Henry James, circulars about venereal diseases, medical books, and Motley's Rise of the Dutch Republic." Macaulay, replying to advocates of the suppression of obscene books, said: "We find it difficult to believe that in a world so full of temptations as this, any gentleman whose life would have been virtuous if he had not read Aristophanes or Juvenal, will be vicious by reading them." Echoing Macaulay, "Jimmy" Walker remarked that he had never heard of a woman seduced by a book. New Mexico has never had an obscenity statute; there is no evidence that, in that state, sexual misconduct is proportionately greater than elsewhere.

### Effect on conduct of young people

Most federal courts (as above noted) now hold that the test of obscenity is the effect on the "mind" of the average normal adult, that effect being determined by the "average conscience of the time," the current "sense of what is right"; and that the statute does not intend "to reduce our treatment of sex to the standard of a child's library in the supposed interest of a salacious few"; United States v. Kennerley, D.C., 209 F. 120, 121.

However, there is much pressure for legislation, designed to prevent juvenile delinquency, which will single out children, i. e., will prohibit the sale to young persons of "obscenity" or other desig-

---

32. Lockhart and McClure, Obscenity and The Courts, 20 L. & Contemp.P. (1955) 587, 595.

33. See Alpert, Judicial Censorship and The Press, 52 Harv.L.Rev. (1938) 40, 72.

nated matter. That problem does not present itself here, since the federal statute is not thus limited. The trial judge in his charge in the instant case told the jury that the "test" under that statute is not the effect of the mailed matter on "those comprising a particular segment of the community", the "young" or "the immature"; and see United States v. Levine, 2 Cir., 83 F.2d 156, 157.

Therefore a discussion of such a children's protective statute is irrelevant here. But, since Judge Clark does discuss the alleged linkage of obscenity to juvenile delinquency, and since it may perhaps be thought that it has some bearing on the question of the effect of obscenity on adult conduct, I too shall discuss it.

The following is a recent summary of studies of that subject:[33a] "(1) Scientific [33b] studies of juvenile delinquency demonstrate that those who get into trouble, and are the greatest concern of the advocates of censorship, are far less inclined to read than those who do not become delinquent. The delinquents are generally the adventurous type, who have little use for reading and other nonactive entertainment. Thus, even assuming that reading sometimes has an adverse effect upon moral behavior, the effect is not likely to be substantial, for those who are susceptible seldom read. (2) Sheldon and Eleanor Glueck, who are among the country's leading authorities on the treatment and causes of juvenile delinquency, have recently published the results of a ten-year study of its causes. They exhaustively studied approximately 90 factors and influences that might lead to or explain juvenile delinquency; but the Gluecks gave no consideration to the type of reading material, if any were read by the delinquents. This is, of course, consistent with their finding that delinquents read very little. When those who know so much about the problem of delinquency among youth—the very group about whom the advocates of censorship are most concerned—conclude that what delinquents read has so little effect upon their conduct that it is not worth investigating in an exhaustive study of causes, there is good reason for serious doubts concerning the basic hypothesis on which obscenity censorship is dependent. (3) The many other influences in society that stimulate sexual desire are so much more frequent in their influence and so much more potent in their effect that the influence of reading is likely, at most, to be relatively insignificant in the composite of forces that lead an individual into conduct deviating from the community sex standards. * * * And the studies demonstrating that sex knowledge seldom results from reading indicates the relative unimportance of literature in sexual thoughts and behavior as compared with other factors in society."[34]

---

33a. Lockhart and McClure, Literature, The Law of Obscenity and The Constitution, 38 Minn.L.Rev. (1954) 295, 385–386.
    Perhaps some of the reasoning of this summary is a bit too sweeping. For a more cautious summary, see the Jahoda report, discussed infra.

33b. I, for one, deplore the use of the word "scientific" as applied to social studies. See, e. g., Frank, 4 J. of Public Law (1955) 8.

34. Novick, Superintendent of the New York Training School for Girls, writes: "In the public eye today juvenile delinquency is alternately the direct result of progressive education, horror comics, T. V. programs, and other pet peeves of our present society * * * This is not a new phenomenon. Each generation of adults has been concerned about the behavior of its children and has looked for a scapegoat on which to place the blame for its delinquency. At the same time, adults have always sought a panacea which would cure the problem. It is sufficient to note that delinquency has always risen during periods of stress and strain, and the era in which we are living is no exception * * * Neither do restrictive measures such as * * * censorship of reading matter * * * prevent delinquency. They merely have an effect upon the manner in which the delinquency will be expressed." Novick, Integrating the Delinquent and His Community, 20 Fed.Probation, 38, 40 (1956).
    Charles Lamb (whose concern with children he manifested in his Tales From Shakespeare) had no belief that un-

·. Judge Clark, however, speaks of "the strongly held views of those with competence in the premises as to the very direct connection" of obscenity "with the development of juvenile delinquency." He cites and quotes from a recent opinion of the New York Court of Appeals and an article by Judge Vanderbilt, which in turn, cite the writings of persons thus described by Judge Clark as "those with competence in the premises." One of the cited writings is a report, by Dr. Jahoda and associates, entitled The Impact of Literature: A Psychological Discussion of Some Assumptions in the Censorship Debate (1954).[35] I have read this report (which is a careful survey of all available studies and psychological theories). I think it expresses an attitude quite contrary to that indicated by Judge Clark. In order to avoid any possible bias in my interpretation of that report, I thought it well to ask Dr. Jahoda to write her own summary of it, which, with her permission, I shall quote. (In doing so, I am following the example of Mr. Justice Jackson who, in Federal Trade Commission v. Ruberoid Co., 343 U.S. 470, 485,

censored reading harmed children: In his Essays of Elia he wrote of the education of his cousin Bridget, "She was tumbled early into a spacious closet of good old English reading" (which included Elizabethan and Restoration dramas and 18th century novels) "without much selection or prohibition and browsed at will upon that fair and wholesome pasturage. Had I twenty girls, they should be brought up exactly in this fashion."

Judge Curtis Bok, perhaps remembering Lamb's remarks, said of the publications before him in Commonwealth v. Gordon, 1949, 66 Pa.Dist. & Co.R. 101: "It will be asked whether one would care to have one's young daughter read these books. I suppose that by the time she is old enough to wish to read them she will have learned the biologic facts of life and the words that go with them. There is something seriously wrong at home if those facts have not been met and faced and sorted by then; it is not children so much as parents that should receive our concern about this. I should prefer that my own three daughters meet the facts of life and the literature of the world in my library than behind a neighbor's barn, for I can face the adversary there directly. If the young ladies are appalled by what they read, they can close the book at the bottom of page one; if they read further, they will learn what is in the world and in its people, and no parents who have been discerning with their children need fear the outcome. Nor can they hold it back, for life is a series of little battles and minor issues, and the burden of choice is on us all, every day, young and old. Our daughters must live in the world and decide what sort of women they are to be, and we should be willing to prefer their deliberate and informed choice of decency rather than an innocence that continues to spring from ignorance. If that

choice be made in the open sunlight, it is more apt than when made in shadow to fall on the side of honorable behavior."

Watson writes similarly: "What innocent children most need is not a sterile environment from which all evidence of * * * lust * * * has been removed, but help in interpreting the evil which is an inescapable part of life. Home, school and church should cooperate not to create an artificial hot-house insulation for life's realities but to enable children to respond, "Ah, yes! I understand!" Most children in middle class homes alarm their parents by spells in which they overdo imaginative violence, sex talk, worry about death, listening to cowboy programs, reading inane comics, exchanging dirty stories, and most of them in time, with or without adult counsel, will work their way through to better standards of taste. Protection by censorship might leave such children weaker and more susceptible; some of these childhood interests, like measles, contribute to a later life of useful immunity." Watson, Some Effects on Censorship upon Society, in 5 Social Meaning of Legal Concepts (1953) 73, 83–85.

Said Milton: "They are not skilful considerers of human things, who imagine to remove sin by removing the matter of sin." A renowned sinner declared that he "could resist everything but temptation."

35. Cited in a passage in Brown v. Kingsley Books, Inc., 1 N.Y.2d 177, 151 N.Y.S. 2d 639, 134 N.E.2d 461, quoted by Judge Clark. Judge Clark cites and quotes from this opinion only in connection with his statement of our judicial "lack of knowledge of the social bearing of this problem". However, his quotation from that New York opinion cites the Jahoda report, and I therefore assume that Judge Clark intended to include Dr. Jahoda among "those with competence in the premises".

72 S.Ct. 800, 809, 96 L.Ed. 1081, acknowledged that he relied on "an unpublished treatise", i. e., one not available to the parties. If that practice is proper, I think it similarly proper to quote an author's unpublished interpretation of a published treatise.) Dr. Jahoda's summary reads as follows:

"Persons who argue for increased censorship of printed matter often operate on the assumption that reading about sexual matters or about violence and brutality leads to anti-social actions, particularly to juvenile delinquency. An examination of the pertinent psychological literature has led to the following conclusions:

"1. There exists no research evidence either to prove or to disprove this assumption definitively.

"2. In the absence of scientific proof two lines of psychological approach to the examination of the assumption are possible: (a) a review of what is known on the causes of juvenile delinquency; and (b) review of what is known about the effect of literature on the mind of the reader.

"3. In the vast research literature on the causes of juvenile delinquency there is no evidence to justify the assumption that reading about sexual matters or about violence leads to delinquent acts. Experts on juvenile delinquency agree that it has no single cause. Most of them regard early childhood events, which precede the reading age, as a necessary condition for later delinquency. At a later age, the nature of personal relations is assumed to have much greater power in determining a delinquent career than the vicarious experiences provided by reading matter. Juvenile delinquents as a group read less, and less easily, than non-delinquents. Individual instances are reported in which so-called 'good' books allegedly influenced a delinquent in the manner in which 'bad' books are assumed to influence him.

"Where childhood experiences and subsequent events have combined to make delinquency psychologically likely, reading could have one of two effects: it could serve a trigger function releasing the criminal act or it could provide for a substitute outlet of aggression in fantasy, dispensing with the need for criminal action. There is no empirical evidence in either direction.

"4. With regard to the impact of literature on the mind of the reader, it must be pointed out that there is a vast overlap in content between all media of mass communication. The daily press, television, radio, movies, books and comics all present their share of so-called 'bad' material, some with great realism as reports of actual events, some in clearly fictionalized form. It is virtually impossible to isolate the impact of one of these media on a population exposed to all of them. Some evidence suggests that the particular communications which arrest the attention of an individual are in good part a matter of choice. As a rule, people do not expose themselves to everything that is offered, but only to what agrees with their inclinations.

"Children, who have often not yet crystallized their preferences and have more unspecific curiosity than many adults, are therefore perhaps more open to accidental influences from literature. This may present a danger to youngsters who are insecure or maladjusted who find in reading (of 'bad' books as well as of 'good' books) an escape from reality which they do not dare face. Needs which are not met in the real world are gratified in a fantasy world. It is likely, though not fully demonstrated, that excessive reading of comic books will intensify in children those qualities which drove them to the comic book world to begin with: an inability to face the world, apathy, a belief that the individual is hopelessly impotent and driven by uncontrollable forces and, hence, an acceptance of violence and brutality in the real world.

"It should be noted that insofar as causal sequence is implied, insecurity and maladjustment in a child must precede this exposure to the written word in order to lead to these potential effects. Unfortunately, perhaps, the reading of

Shakespeare's tragedies or of Anderson's and Grimm's fairy tales might do much the same."

Most of the current discussion of the relation between children's reading and juvenile delinquency has to do with so-called "comic books" which center on violence (sometimes coupled with sex) rather than mere obscenity. Judge Vanderbilt, in an article from which Judge Clark quotes, cites Feder, Comic Book Regulation (University of California, Bureau of Public Administration, 1955 Legislative Problems No. 2).[36] Feder writes: "It has never been determined definitely whether or not comics portraying violence, crime and horror are a cause of juvenile delinquency."

Judge Vanderbilt, in the article from which Judge Clark quotes, also cites Wertham, Seduction of the Innocent (1954).[37] Dr. Wertham is the foremost proponent of the view that "comic books" do contribute to juvenile delinquency. The Jahoda Report takes issue with Dr. Wertham, who relies much on a variety of the *post-hoc-ergo-propter-hoc* variety of argument, i. e., youths who had read "comic books" became delinquents. The argument, at best, proves too much: Dr.

Wertham points to the millions of young readers of such books; but only a fraction of these readers become delinquents. Many of the latter also chew gum, drink coca-cola, and wear soft-soled shoes. Moreover, Dr. Wertham specifically says (p. 298) that he is little concerned with allegedly obscene publications designed for reading by adults, and (pp. 303, 316, 348) that the legislation which he advocates would do no more than forbid the sale or display of "comic books" to minors. As previously noted, the federal obscenity statute is not so restricted.

Maybe some day we will have enough reliable data to show that obscene books and pictures do tend to influence children's sexual conduct adversely. Then a federal statute could be enacted which would avoid constitutional defects by authorizing punishment for using the mails or interstate shipments in the sale of such books and pictures to children.[38]

It is, however, not at all clear that children would be ignorant, in any considerable measure, of obscenity, if no obscene publications ever came into their hands. Youngsters get a vast deal of education in sexual smut from companions of their own age.[39] A verbatim report of con-

36. Vanderbilt, Impasse In Justice, Wash. U.L.Q. (1956), 267, 302.

37. Ibid.

38. Such a statute was long ago suggested. See Ernst and Seagle, To the Pure (1928) 277.

39. Cf. United States v. Dennett, 2 Cir., 39 F.2d 564, 568, 76 A.L.R. 1092.
Alpert (loc. cit. at 74) writes of the American Youth Commission study of the conditions and attitudes of young people in Maryland between the ages of sixteen and twenty-four, as reported in 1938: "For this study Maryland was deliberately picked as a 'typical' state, and, according to the Commission, the 13,528 young people personally interviewed in Maryland can speak for the two hundred and fifty thousand young people in Maryland and the twenty millions in the United States. The chief source of sex "education" for the youth of all ages and all religious groups was found to be the youth's contemporaries.' Sixty-six percent of the boys and forty percent of the girls reported that what they knew

about sex was more or less limited to what their friends of their own age had told them. After 'contemporaries' and the youth's home, the source that is next in importance is the school, from which about 8 percent of the young people reported they had received most of their sex information. A few, about 4 percent, reported they owed most to books, while less than 1 percent asserted that they had acquired most of their information from movies. Exactly the same proportion specified the church as the chief source of their sex information. These statistical results are not offered as conclusive; but that they do more than cast doubt upon the assertion that 'immoral' books, corrupt and deprave must be admitted. These statistical results placed in the scale against the weight of the dogma upon which the law is founded lift the counterpane high. Add this: that 'evil manners' are as easily acquired without books as with books; that crowded slums, machine labor, barren lives, starved emotions, and unreasoning minds are far more dangerous to morals

versations among young teen-age boys (from average respectable homes) will disclose their amazing proficiency in obscene language, learned from other boys.[40] Replying to the argument of the need for censorship to protect the young Milton said: "Who shall regulate all the * * * conversation of our youth * * * appoint what shall be discussed * * *?" Most judges who reject that view are long past their youth and have probably forgotten the conversational ways of that period of life: "I remember when I was a little boy," said Mr. Dooley, "but I don't remember how I was a little boy."

### The obscenity statute and the reputable press.

Let it be assumed, for the sake of the argument, that contemplation of published matter dealing with sex has a significant impact on children's conduct. On that assumption, we cannot overlook the fact that our most reputable newspapers and periodicals carry advertisements and photographs displaying women in what decidedly are sexually alluring postures,[41] and at times emphasizing the importance of "sex appeal." That women are there shown scantily clad, increases "the mystery and allure of the bodies that are hidden," writes an eminent psychiatrist. "A leg covered by a silk stocking is much more attractive than a naked one; a bosom pushed into shape by a brassiere is more alluring than the pendant realities."[42] Either, then, the statute must be sternly applied to prevent the mailing of many reputable newspapers and periodicals containing such ads and photographs, or else we must acknowl-

edge that they have created a cultural atmosphere for children in which, at a maximum, only the most trifling additional effect can be imputed to children's perusal of the kind of matter mailed by the defendant.

### The obscenity statute and the newspapers

Because of the contrary views of many competent persons, one may well be sceptical about Dr. Wertham's thesis. However, let us see what, logically, his crusade would do to the daily press: After referring repeatedly to the descriptions, in "comic books" and other "mass media," of violence combined with sadistic sexual behavior, descriptions which he says contribute to juvenile delinquency, he writes, "Juvenile delinquency reflects the social values current in a society. Both adults and children absorb these social values in their daily lives, * * * and also in *all the communications through the mass media* * * * Juvenile delinquency holds up a mirror to society * * * It is self-understood that such a pattern in a mass medium does not come from nothing * * * Comic books are not the disease, they are only a symptom * * * The same social forces that made comic books make other social evils, and the same social forces that keep comic crime books keep the other social evils the way they are." (Emphasis added.)

Now the daily newspapers, especially those with immense circulations, constitute an important part of the "mass media"; and each copy of a newspaper sells for much less than a "comic book." Virtually all the sorts of descriptions, of sex

---

than any so-called obscene literature. True, this attack is tangential, but a social problem is here involved, and the weight of this approach should be felt." Id. at 74.

40. For such a report, slightly expurgated for adult readers, see Cleckley, The Mask of Sanity (1950) 135–137.

41. Cf. Larrabee, The Cultural Context of Sex Censorship, 20 L. & Contemp.Prob. (1955) 672, 684.

42. Myerson, Speaking of Man (1950) 92. See also the well known chapter on clothes in Anatole France's Penguin Island.

Dr. Wertham discussing "comic books," makes much of the advertisements they carry. He speaks of their "breast ads," and also of their playing up of "glamour girls," their stress on the "sexy," their emphasis on women's "secondary sexual characteristics." Is not this also descriptive of the advertisements in our "best periodicals"?

mingled with violence, which Dr. Wertham finds in the "comic books," can be found, often accompanied by gruesome photographs, in those daily journals. Even a newspaper, which is considered unusually respectable, published prominently on its first page, on August 26, 1956, a true story of a "badly decomposed body" of a 24 year old woman school teacher, found in a clump of trees. The story reported that police had quoted a 29 year old salesman as saying that "he drove to the area" with the school teacher, that "the two had relations on the ground, and later got into an argument," after which he "struck her three times on the back of the head with a rock, and, leaving her there, drove away." Although today no one can so prove, one may suspect that such stories of sex and violence in the daily press have more impact on young readers than do those in the "comic books," since the daily press reports reality while the "comic books" largely confine themselves to avowed fiction or fantasy.[42a] Yet Dr. Wertham, and most others who propose legislation to curb the sale of "comic books" to children, propose that it should not extend to newspapers.[42b] Why not?

The question is relevant in reference to the application of the obscenity statute: Are our prosecutors ready to prosecute reputable newspaper publishers under that Act? I think not. I do not at all urge such prosecutions. I do suggest that the validity of that statute has not been vigorously challenged because it has not been applied to important persons like those publishers but, instead, has been enforced principally against relatively inconspicuous men like the defendant here.

*Da Capo: Available data seem wholly insufficient to show that the obscenity statutes come within any exception to the First Amendment.*

I repeat that, because that statute is not restricted to obscene publications mailed for sale to minors, its validity should be tested in terms of the evil effects of adult reading of obscenity on adult conduct.[43] With the present lack of evidence that publications probably have such effects, how can the government discharge its burden of demonstrating sufficiently that the statute is within the narrow exceptions to the scope of the First Amendment? One would think that the mere possibility of a causal relation to misconduct ought surely not be enough.

Even if Congress had made an express legislative finding of the probable evil influence, on adult conduct, of adult reading or seeing obscene publications,[43a] the courts would not be bound by that finding, if it were not justified in fact. See, e. g., Chastleton Corp. v. Sinclair, 264 U.S. 543, 44 S.Ct. 405, 406, 68 L.Ed. 841, where the Court (per Holmes, J.) said of a statute (declaring the existence of an emergency) that "a Court is not at liberty to shut its eyes to an obvious mistake, when the validity of the law depends upon the truth of what is declared." And the Court there and elsewhere has held that the judiciary may use judicial notice in ascertaining the truth of such a legislative declaration.[44]

---

42a. It is arguable that the fact that a publication is regarded by the reader as "pornography" influences its impact on him. No relevant reliable data, however, is available.

42b. "No one would dare ask of a newspaper that it observe the same restraints that are constantly being demanded of * * * the comic book." Larrabee, The Cultural Context of Sex Censorship, 20 Law and Contemp.Problems (1955) 673, 679.

43. See United States v. Levine, 2 Cir., 83 F.2d 156, 157 to the effect that "what counts is its effect, not upon any particular class, but upon all those whom it is likely to reach."

43a. Congress has made no such finding. There is none such in the Senate Report (supporting the 1955 amendment of Section 1461) quoted by Judge Clark in his footnote 5.

44. Cf. United States v. Rumely, 345 U.S. 41, 44, 73 S.Ct. 543, 97 L.Ed. 770.

*If the obscenity statute is valid, why may Congress not validly provide punishment for mailing books which will provoke thoughts it considers undesirable about religion or politics?*

If the statute is valid, then, considering the foregoing, it would seem that its validity must rest on this ground: Congress, by statute, may constitutionally provide punishment for the mailing of books evoking mere thoughts or feelings about sex, if Congress considers them socially dangerous, even in the absence of any satisfactory evidence that those thoughts or feelings will tend to bring about socially harmful deeds. If that be correct, it is hard to understand why, similarly, Congress may not constitutionally provide punishment for such distribution of books evoking mere thoughts or feelings, about religion or politics, which Congress considers socially dangerous, even in the absence of any satisfactory evidence that those thoughts or feelings will tend to bring about socially dangerous deeds.

### 2. The Judicial exception of the "classics"

As I have said, I have no doubt the jury could reasonably find, beyond a reasonable doubt, that many of the publications mailed by defendant were obscene within the current judicial definition of the term as explained by the trial judge in his charge to the jury. But so, too, are a multitude of recognized works of art found in public libraries. Compare, for instance, the books which are exhibits in this case with Montaigne's Essay on Some Lines of Virgil or with Chaucer. Or consider the many nude pictures which the defendant transmitted through the mails, and then turn to the reproductions in the articles on painting and sculpture in the Encyclopedia Britannica (14th edition):[45] Some of the latter are no less "obscene" than those which led to the defendants' conviction. Yet these Encyclopedia volumes are readily accessible to everyone, young or old, and, without let or hindrance, are frequently mailed to all parts of the country. Catalogues, of famous art museums, almost equally accessible and also often mailed, contain reproductions of paintings and sculpture, by great masters, no less "obscene."[46]

To the argument that such books (and such reproductions of famous paintings and works of sculpture) fall within the statutory ban, the courts have answered that they are "classics,"—books of "literary distinction" or works which have "an accepted place in the arts," including, so this court has held, Ovid's Art of Love and Boccacio's Decameron.[47] There is a "curious dilemma" involved in this answer that the statute condemns "only books which are dull and without merit," that in no event will the statute be applied to the "classics," i. e., books "of literary distinction."[48] The courts have not explained how they escape that dilemma, but instead seem to have gone to sleep (although rather uncomfortably) on its horns.

This dilemma would seem to show up the basic constitutional flaw in the stat-

45. See, e. g., Vol. 17, p. 36, Plate 3, No. 4, reproducing Botticelli's "Birth of Venus"; p. 38, Plate VIII, No. 2, reproducing Titian's "Woman on a Couch"; Vol. 20, p. 202, Plate V, No. 8, reproducing Clodion's "Nymph and Satyr"; p. 204, Plate VI, reproducing Rodin's "The Kiss."

See Parmelee v. United States, 72 App. D.C. 203, 113 F.2d 729, 734 and note 19.

46. See, e. g., Masterpieces of Painting From The National Gallery of Art (Cairns and Walker ed. 1944) 68, 72, 114; Catalogue of Pictures Collected by Yale Alumni (1956) 3, 15, 55, 134, 137, 195.

47. See, e. g., United States v. Levine, 2 Cir., 83 F.2d 156, 157; United States v. One Book Entitled Ulysses, 2 Cir., 72 F.2d 705; Roth v. Goldman, 2 Cir., 172 F.2d 788.

48. See Roth v. Goldman, 2 Cir., 172 F.2d 788.

No one can argue with a straight face (1) that reading an obscene "classic" in a library has less harmful effects or (2) that, as the "classics" often are published in expensive volumes, they usually affect only persons who have large incomes, and that such persons' right to read is peculiarly privileged.

**820**

ute: No one can reconcile the currently accepted test of obscenity with the immunity of such "classics" as e. g., Aristophanes' Lysistratra, Chaucer's Canterbury Tales, Rabelais' Gargantua and Pantagruel, Shakespeare's Venus and Adonis, Fielding's Tom Jones, or Balzac's Droll Stories. For such "obscene" writings, just because of their greater artistry and charm, will presumably have far greater influence on readers than dull inartistic writings.

It will not do to differentiate a "classic," published in the past, on the ground that it comported with the average moral attitudes at the time and place of its original publication. Often this was not true. It was not true, for instance, of Balzac's Droll Stories,[49] a "classic" now freely circulated by many public libraries, and which therefore must have been transported by mail (or in interstate commerce). More to the point, if the issue is whether a book meets the American common conscience of the present time, the question is how "average" Americans now regard the book, not how it was regarded when first published, here or abroad. Why should the age of an "obscene" book be relevant? After how many years—25 or 50 or 100—does such a writing qualify as a "classic"?

The truth is that the courts have excepted the "classics" from the federal obscenity statute, since otherwise most Americans would be deprived of access to many masterpieces of literature and the pictorial arts, and a statute yielding such deprivation would not only be laughably absurd but would squarely oppose the intention of the cultivated men who framed and adopted the First Amendment.

This exception—nowhere to be found in the statute [50]—is a judge-made device invented to avoid that absurdity. The fact that the judges have felt the necessity of seeking that avoidance, serves to suggest forcibly that the statute, in its attempt to control what our citizens may read and see, violates the First Amendment. For no one can rationally justify the judge-made exception. The contention would scarcely pass as rational that the "classics" will be read or seen solely by an intellectual or artistic elite; for, even ignoring the snobbish, undemocratic, nature of this contention, there is no evidence that that elite has a moral fortitude (an immunity from moral corruption) superior to that of the "masses." And if the exception, to make it rational, were taken as meaning that a contemporary book is exempt if it equates in "literary distinction" with the "classics," the result would be amazing: Judges would have to serve as literary critics; jurisprudence would merge with aesthetics; authors and publishers would consult the legal digests for legal-artistic precedents; we would some day have a Legal Restatement of the Canons of Literary Taste.

The exception of the "classics" is therefore irrational. Consequently, it would seem that we should interpret the statute rationally—i. e., without that exception. If, however, the exception, as an exception, is irrational, then it would appear that, to render the statute valid, the standard applied to the "classics" should be applied to all books and pictures. The result would be that, in order to be constitutional, the statute must be wholly inefficacious.

3. How censorship under the statute actually operates:

*(a) Prosecutors, as censors, actually exercise prior restraint.*

Fear of punishment serves as a powerful restraint on publication, and fear of punishment often means, practically, fear of prosecution. For most men dread indictment and prosecution; the publicity alone terrifies, and to defend a criminal action is expensive. If the definition of

---

49. See discussion in Roth v. Goldman, 2 Cir., 172 F.2d at page 797.

50. The importation statute relating to obscenity, 19 U.S.C.A. § 1305, does make an explicit exception of the "so-called classics or books of recognized and established literary * * * merit," but only if they are "imported for noncommercial purposes"; if so, the Secretary of the Treasury has discretion to admit them.

obscenity had a limited and fairly well known scope, that fear might deter restricted sorts of publications only. But on account of the extremely vague judicial definition of the obscene,[51] a person threatened with prosecution if he mails (or otherwise sends in interstate commerce)[52] almost any book which deals in an unconventional, unorthodox, manner with sex,[53] may well apprehend that, should the threat be carried out, he will be punished. As a result, each prosecutor becomes a literary censor (i. e., dictator) with immense unbridled power, a virtually uncontrolled discretion.[54] A statute would be invalid which gave the Postmaster General the power, without reference to any standard, to close the mails to any publication he happened to dislike.[55] Yet, a federal prosecutor, under the federal obscenity statute, approximates that position: Within wide limits, he can (on the advice of the Postmaster General or on no one's advice) exercise such a censorship by threat, without a trial, without any judicial supervision, capriciously and arbitrarily. Having no special qualifications for that task, nevertheless, he can, in large measure, determine at his will what those within his district may not read on sexual subjects.[56] In that way, the statute

51. See infra, point 9, for further discussion of that vagueness.

52. As to interstate transportation, see 18 U.S.C. § 1462 which contains substantially the same provisions as 18 U.S.C. § 1461.

53. See Kaplan, Obscenity as An Esthetic Category, 20 Law & Contemp.Problems (1955) 544, 551–552 as to "conventional obscenity," which he defines as "the quality of any work which attacks sexual patterns and practices. In essence, it is the presentation of a sexual heterodoxy, a rejection of accepted standards of sexual behavior. Zola, Ibsen and Shaw provide familiar examples. It surprises no one that the author of Nana also wrote J'Accuse; of Ghosts, An Enemy of the People; of Mrs. Warren's Profession, Saint Joan."

See also, Lockhart and McClure, Obscenity in the Courts, 20 Law & Contemp. Problems (1955) 586, 596–597 as to "ideological obscenity"; they note that the courts have generally refrained (at least explicitly) from basing their decisions on rulings that literally may be prescribed to guard against a change in accepted moral standards, "because any such ruling would fly squarely in the face of the very purpose for guaranteeing freedom of expression and would thus raise serious constitutional questions."

54. One court, at the suit of a publisher, enjoined a chief of police—who went beyond threat of prosecution and ordered booksellers not to sell certain books—on the ground that the officer had exceeded his powers; New American Library of World Literature v. Allen, D.C. Ohio, 114 F.Supp. 823. In another similar case, where a prosecutor was enjoined, the injunction order was much modified on appeal; Bantam Books, Inc., v. Melko, 25 N.J.Super. 292, 96 A.2d 47, modified 14 N.J. 524, 103 A.2d 256.

If, however, the prosecutor confines himself to a mere threat of prosecution, the traditional reluctance to restrain criminal prosecutions will very probably make it difficult to obtain such an injunction. Sunshine Book Co. v. McCaffrey, Sup., 112 N.Y.S.2d 476; see also 22 U. of Chicago L.Rev. (1954) 216; 68 Harv. L.Rev. (1955) 489.

This may be particularly true with respect to a federal prosecutor. See Mr. Justice Jackson, The Federal Prosecutor, 24 J. of Am.Jud.Soc. (1940) 18: "The (federal) prosecutor has more control over life, liberty, and reputation than any other person in America. His discretion is tremendous. He can have citizens investigated and, if he is that kind of person, he can have this done to the tune of public statements and veiled or unveiled intimations. Or the prosecutor may choose a more subtle course and simply have a citizen's friends interviewed. The prosecutor can order arrests, present cases to the grand jury in secret session, and on the basis of his one-sided presentation of the facts, can cause the citizen to be indicted and held for trial. He may dismiss the case before trial, in which case the defense never has a chance to be heard."

55. See, e. g., Joseph Burstyn, Inc., v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098.

56. It is, therefore, doubtful whether, as suggested by Emerson (loc. cit. at 656–660), a statute calling for punishment involves very much less arbitrary conduct and very much less censorship than one calling for prior restraint. In actual fact, by his threats of prosecution, the prose-

brings about an actual prior restraint of free speech and free press which strikingly flouts the First Amendment.[57]

*(b) Judges as censors.*

When a prosecution is instituted and a trial begins, much censorship power passes to the trial judge: If he sits without a jury, he must decide whether a book is obscene. If the trial is by jury, then, if he thinks the book plainly not obscene, he directs a verdict for the accused or, after a verdict of guilt, enters a judgment of acquittal. How does the judge determine whether a book is obscene? Not by way of evidence introduced at the trial, but by way of some sort of judicial notice. Whence come the judicial notice data to inform him?

Those whose views most judges know best are other lawyers. Judges can and should take judicial notice that, at many gatherings of lawyers at Bar Association or of alumni of our leading law schools,[58] tales are told fully as "obscene" as many of those distributed by men, like defendant, convicted for violation of the obscenity statute. Should not judges, then set aside such convictions? If they do not, are they not somewhat arrogantly concluding that lawyers are an exempt elite, unharmed by what will harm the multitude of other Americans? If lawyers are not such an elite then, since, in spite of the "obscene" tales lawyers frequently tell one another, data are lacking that lawyers as a group become singularly addicted to depraved sexual conduct, should not judges conclude that "obscenity" does not importantly contribute to such misconduct, and that therefore the statute is unconstitutional?

*(c) Jurors as censors.*

If in a jury case, the trial judge does not direct a verdict or enter a judgment of acquittal, the jury exercises the censorship power. Courts have said that a jury has a peculiar aptitude as a censor of obscenity, since, representing a cross-section of the community, it knows peculiarly well the "common conscience" of the time. Yet no statistician would conceivably accept the views of a jury—twelve persons chosen at random—as a fair sample of community attitudes on such a subject as obscenity. A particular jury may voice the "moral sentiments" of a generation ago, not of the present time.

Each jury verdict in an obscenity case has been sagely called "really a small bit of legislation ad hoc".[59] So each jury constitutes a tiny autonomous legislature. Any one such tiny legislature, as experience teaches, may well differ from any other, in thus legislating as to obscenity. And, one may ask, was it the purpose of

---

cutor does exercise prior restraint. Much, therefore, that Emerson says of prior restraint authorized by statute applies as well as to censorship through a prosecutor's threats of prosecution: The "procedural safeguards built around criminal prosecution" (the stronger burden of proof, the stricter rules of evidence, the tighter procedure) are likewise absent. The "decision rests with a single functionary," an official, rather than with the courts. The prosecutor, by threats of prosecution, accomplishes prior restraint "behind a screen of informality and partial concealment that seriously curtails opportunity for public appraisal" and entailing the "chance of discrimination and other abuse." The "policies and actions" of the prosecutor, in his censorship by threats of prosecution, are not "likely to be known or publicly debated; material and study and criticism" are not "readily available."

57. For startling instances of "prosecutor censorship" see Blanshard, The Right to Read (1955) 184–186, 190; 22 U. of Chicago L.Rev. (1954) 216.

58. See Roth v. Goldman, 2 Cir., 172 F.2d 788, at page 796 (concurring opinion): "One thinks of the lyrics sung at many such gatherings by a certain respected and conservative member of the faculty of a great law-school which considers itself the most distinguished and which is the Alma Mater of many judges sitting on upper courts."

Aubrey's Lives, containing many "salacious" tales, delights some of our greatest judges.

Mr. Justice Holmes was a constant reader of "naughty French novels." See Bent, Justice O. W. Holmes (1932) 16, 134.

59. United States v. Levine, 2 Cir., 83 F. 2d 156, 157.

the First Amendment, to authorize hundreds of divers jury-legislatures, with discrepant beliefs, to decide whether or not to enact hundreds of divers statutes interfering with freedom of expression? (I shall note, infra, the vast difference between the applications by juries of the "reasonable man" standard and the "obscenity" standard.)

### 4. The dangerously infectious nature of governmental censorship of books

Governmental control of ideas or personal preferences is alien to a democracy. And the yearning to use governmental censorship of any kind is infectious. It may spread insidiously. Commencing with suppression of books as obscene, it is not unlikely to develop into official lust for the power of thought-control in the areas of religion, politics, and elsewhere. Milton observed that "licensing of books * * * necessarily pulls along with it so many other kinds of licensing." J. S. Mill noted that the "bounds of what may be called moral police" may easily extend "until it encroaches on the most unquestionably legitimate liberty of the individual." We should beware of a recrudescence of the undemocratic doctrine uttered in the 17th century by Berkeley, Governor of Virginia: "Thank God there are no free schools or preaching, for learning has brought disobedience into the world, and printing has divulged them. God keep us from both."

### The people as self-guardians: censorship by public opinion, not by government

Plato, who detested democracy, proposed to banish all poets; and his rulers were to serve as "guardians" of the people, telling lies for the people's good, vigorously suppressing writings these guardians thought dangerous.[60] Govern-mental guardianship is repugnant to the basic tenet of our democracy: According to our ideals, our adult citizens are self-guardians, to act as their own fathers, and thus become self-dependent.[61] When our governmental officials act towards our citizens on the thesis that "Papa knows best what's good for you," they enervate the spirit of the citizens: To treat grown men like infants is to make them infantile, dependent, immature.

So have sagacious men often insisted. Milton, in his Areopagitica, denounced such paternalism: "We censure them for a giddy, vicious and unguided people, in such sick and weak (a) state of faith and discretion as to be able to take down nothing but through the pipe of a licensor." "We both consider the people as our children," wrote Jefferson to Dupont de Nemours, "but you love them as infants whom you are afraid to trust without nurses, and I as adults whom I freely leave to self-government." Tocqueville sagely remarked: "No form or combination of social policy has yet been devised to make an energetic people of a community of pusillanimous and enfeebled citizens." "Man," warned Goethe, "is easily accustomed to slavery and learns quickly to be obedient when his freedom is taken from him." Said Carl Becker, "Self-government, and the spirit of freedom that sustains it, can be maintained only if the people have sufficient intelligence and honesty to maintain them with a minimum of legal compulsion. This heavy responsibility is the price of freedom."[62] The "great art," according to Milton, "lies to discern in what the law is to bid restraint and punishment, and in what things persuasion only is to work." So we come back, once more, to Jefferson's advice: The only completely demo-

---

60. Plato furnished "an ideal blueprint for a totalitarian society"; Chroust, Book Rev., 1 Natural Law Forum (1956) 135, 141. See also Popper, The Open Society and Its Enemies (1950); Frank, Courts on Trial (1949) 146–147, 158, 350, 360, 405–406; Frank, Fate and Freedom (1949) 119, 319, note 25, 365, note 10; Frank, If Men Were Angels (1942) 192; Fite, The Platonic Legend (1934); Catlin, The Story of the Political Philosophers (1939) 52, 58, 65–66; Kallen, Ethical Aspects of Censorship, in Protection of Public Morals Through Censorship (1953) 34, 53–54.

61. See Frank, Self Guardianship and Democracy, 16 Am.Scholar (1947) 265.

62. Becker, Freedom and Responsibility in the American Way of Life (1945) 42.

cratic way to control publications which arouse mere thoughts or feelings is through non-governmental censorship by public opinion.

### 5. The seeming paradox of the First Amendment.

Here we encounter an apparent paradox: The First Amendment, judicially enforced, curbs public opinion when translated into a statute which restricts freedom of expression (except that which will probably induce undesirable conduct). The paradox is unreal: *The Amendment ensures that public opinion —the "common conscience of the time" —shall not commit suicide through legislation which chokes off today the free expression of minority views which may become the majority public opinion of tomorrow.*

*Private persons or groups, may validly try to influence public opinion.*

The First Amendment obviously has nothing to do with the way persons or groups, not a part of government, influence public opinion as to what constitutes "decency" or "obscenity." The Catholic Church, for example, has a constitutional right to persuade or instruct its adherents not to read designated books or kinds of books.

### 6. The fine arts are within the First Amendment's protection.

"The framers of the First Amendment," writes Chafee, "must have had literature and art in mind, because our first national statement on the subject of 'freedom of the press,' the 1774 address of the Continental Congress to the inhabitants of Quebec, declared, 'The importance of this (freedom of the press) consists, beside the advancement of truth, science, morality and *arts* in general, in its diffusion of liberal sentiments on the administration of government.'" [63] 165 years later, President Franklin Roosevelt said, "The arts cannot thrive except where men are free to be themselves and to be in charge of the discipline of their own energies and ardors. The conditions for democracy and for art are one and the same. What we call liberty in politics results in freedom of the arts." [64] The converse is also true.

In our industrial era when, perforce, economic pursuits must be, increasingly, governmentally regulated, it is especially important that the realm of art—the non-economic realm—should remain free, unregimented, the domain of free enterprise, of unhampered competition at its maximum. [65] An individual's taste is his own, private, concern. *De gustibus non disputandum* represents a valued democratic maxim.

Milton wrote: "For though a licenser should happen to be judicious more than the ordinary, yet his very office * * * enjoins him to let pass nothing but what is vulgarly received already." He asked, "What a fine conformity would it starch us all into? * * * We may fall * * into a gross conformity stupidly * * " In 1859, J. S. Mill, in his essay on Liberty, maintained that conformity in taste is not a virtue but a vice. "The danger," he wrote, "is not the excess but the deficiency of personal impulses and preferences. By dint of not following their own nature (men) have no nature to follow * * * Individual spontaneity is entitled to free exercise * * * That so few men dare to be eccentric marks the chief danger of the time." Pressed by the demand for conformity, a people degenerate into "the deep slumber of a decided opinion," yield a "dull and torpid consent" to the accustomed. "Mental despotism" ensues. For "whatever crushes individuality is despotism by whatever name it be called * * * It is not by wearing down into uniformity all that is individual in themselves, but by cultivating it, and calling it forth, within the limits imposed by the rights and interests of others, that human beings become a noble and beautiful

---

63. Chafee, Government and Mass Communication (1947) 53.

64. Message at dedicating exercises of the New York Museum of Modern Art, May 8, 1939.

65. Frank, Fate and Freedom (1945) 194–202.

object of contemplation; and as the works partake the character of those who do them, by the same process human life also becomes rich, diversified, and animating * * * In proportion to the development of his individuality, each person becomes more valuable to himself, and is therefore capable of being more valuable to others. There is a greater fullness of life about his own existence, and when there is more life in the units there is more in the mass which is composed of them."

To vest a few fallible men—prosecutors, judges, jurors—with vast powers of literary or artistic censorship, to convert them into what J. S. Mill called a "moral police," is to make them despotic arbiters of literary products. If one day they ban mediocre books as obscene, another day they may do likewise to a work of genius. Originality, not too plentiful, should be cherished, not stifled. An author's imagination may be cramped if he must write with one eye on prosecutors or juries; authors must cope with publishers who, fearful about the judgments of governmental censors, may refuse to accept the manuscripts of contemporary Shelleys or Mark Twains or Whitmans.[66]

Some few men stubbornly fight for the right to write or publish or distribute books which the great majority at the time consider loathsome. If we jail those few, the community may appear to have suffered nothing. The appearance is deceptive. For the conviction and punishment of these few will terrify writers who are more sensitive, less eager for a fight. What, as a result, they do not write might have been major literary contributions.[67] "Suppression," Spinoza said, "is paring down the state till it is too small to harbor men of talent."

**7.** The motive or intention of the author, publisher or distributor cannot be the test.

Some courts once held that the motive or intention of the author, painter, publisher or distributor constituted the test of obscenity. That test, the courts have abandoned: That a man who mails a book or picture believes it entirely "pure" is no defense if the court finds it obscene. United States v. One Book Entitled Ulysses, 2 Cir., 72 F.2d 705, 708.[68] Nor, conversely, will he be criminally liable for mailing a "pure" publication—Stevenson's Child's Garden of Verses or a simple photograph of the Washington Monument—he mistakenly believes obscene. Most courts now look to the "objective" intention, which can only mean the effect on those who read the book or see the picture;[69] the motive of the mailer is irrelevant because it cannot affect that effect.

**8.** Judge Bok's decision as to the causal relation to anti-social conduct.

In Commonwealth v. Gordon, 1949, 66 Pa.Dist. & Co.R. 101, Judge Bok said: "A book, however sexually impure and pornographic * * * cannot be a present danger unless its reader closes it, lays it aside, and transmutes its erotic allurement into overt action. That such action must inevitably follow as a direct consequence of reading the book does not bear analysis, nor is it borne out by general human experience; too much can intervene and too many diversions take place * * * The only clear and present danger * * * that will satisfy * * * the Constitution * * * is the commission or the imminence of the commission of criminal behavior resulting from the reading of a book. Publica-

---

68. Rosen v. United States, 161 U.S. 29, 41–42, 16 S.Ct. 434, 480, 40 L.Ed. 606.

66. Milton remarked that "not to count him fit to print his mind without a tutor or examiner, lest he should drop * * * something of corruption, is the greatest * * * indignity to a free and knowing spirit that can be put upon him."

67. Cf. Chafee, The Blessings of Liberty (1956) 113.
 Milton said that the "sense" of a great man may "to all posterity be lost for the fearfulness, or the presumptuous rashness of a perfunctory licenser."

69. United States v. Levine, 2 Cir., 83 F.2d 156; Parmelee v. United States, 72 App. D.C. 203, 113 F.2d 729.

tion alone can have no such automatic effect." The constitutional operation of "the statute," Judge Bok continued, thus "rests on narrow ground * * * I hold that (the statute) may constitutionally be applied * * * only where there is a reasonable and demonstrable cause to believe that a crime or misdemeanor has been committed or is about to be committed as the perceptible result of the publication and distribution of the writing in question: the opinion of anyone that a tendency thereto exists or that such a result is self-evident is insufficient and irrelevant. The causal connection between the book and the criminal behavior must appear beyond a reasonable doubt."

I confess that I incline to agree with Judge Bok's opinion. But I think it should be modified in a few respects: (a). Because of the Supreme Court's opinion in the Dennis case, 1951, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, decided since Judge Bok wrote, I would stress the element of probability in speaking of a "clear danger." (b) I think the danger need not be that of probably inducing behavior which has already been made criminal at common law or by statute, but rather of probably inducing any seriously anti-social conduct (i. e., conduct which, by statute, could validly be made a state or federal crime). (c) I think that the causal relation need not be between such anti-social conduct and a particular book involved in the case on trial, but rather between such conduct and a book of the kind or type involved in the case.[70]

9. The void-for-vagueness argument.

There is another reason for doubting the constitutionality of the obscenity statute. The exquisite vagueness of the word "obscenity" is apparent from the way the judicial definition of that word has kept shifting: Once (as we saw)

the courts held a work obscene if it would probably stimulate improper thoughts or desires in abnormal persons; now most courts consider only the assumed impact on the thoughts or desires of the adult "normal" or average human being. A standard so difficult for our ablest judges to interpret is hardly one which has a "well-settled" meaning, a meaning sufficient adequately to advise a man whether he is or is not committing a crime if he mails a book or picture. See, e. g., International Harvester Co. of America v. Commonwealth of Kentucky, 234 U.S. 216, 34 S.Ct. 853, 58 L.Ed 1284; United States v. L. Cohen Grocery Co., 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516; Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322; Cline v. Frink Dairy Co., 274 U.S. 445, 47 S.Ct. 681, 71 L.Ed. 1146; Champlin Refining Co. v. Corporation Commission, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062; Lanzetta v. State of New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888; Musser v. State of Utah, 333 U.S. 95, 68 S.Ct. 397, 92 L.Ed. 562; Winters v. People of State of New York, 333 U.S. 507, 68 S. Ct. 665, 92 L.Ed. 840; cf. United States v. Cardiff, 344 U.S. 174, 73 S.Ct. 189, 97 L.Ed. 200.

If we accept as correct the generally current judicial standard of obscenity— the "average conscience of the time"— that standard still remains markedly uncertain as a guide to judges or jurors— and therefore to a citizen who contemplates mailing a book or picture. To be sure, we trust juries to use their common sense in applying the "reasonable man" standard in prosecutions for criminal negligence (or the like); a man has to take his chances on a jury verdict in such a case, with no certainty that a jury will not convict him although another jury may acquit another man on the same evidence.[71] But that standard has nothing

---

70. According to Judge Bok, an obscenity statute may be validly enforced when there is proof of a causal relation between a particular book and undesirable conduct. Almost surely, such proof cannot ever be adduced. In the instant case, the government did not offer such proof.

71. Nash v. United States, 229 U.S. 373, 377, 33 S.Ct. 780, 57 L.Ed. 1232; United States v. Wurzbach, 280 U.S. 396, 399, 50 S.Ct. 167, 74 L.Ed. 508; United States v. Ragen, 314 U.S. 513, 523, 62 S.Ct. 374, 86 L.Ed. 383.

remotely resembling the looseness of the "obscenity" standard.

There is a stronger argument against the analogy of the "reasonable man" test: Even if the obscenity standard would have sufficient definiteness were freedom of expression not involved, it would seem far too vague to justify as a basis for an exception to the First Amendment. See Stromberg v. People of State of California, 283 U.S. 359, 51 S.Ct. 532, 75 L. Ed. 1117; Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066; Winters v. People of State of New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840; Kunz v. People of State of New York, 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280; Burstyn, Inc., v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098; Callings, Constitutional Uncertainty, 40 Cornell L.Q. (1955) 194, 214–218.

In United States v. Rebhuhn, 2 Cir., 109 F.2d 512, 514, the court tersely rejected the contention that the obscenity statute is too vague, citing and relying on Rosen v. United States, 161 U.S. 29, 16 S.Ct. 434, 480, 40 L.Ed. 606. However the Rosen case did not deal with that subject but merely with the sufficiency of the wording of an indictment under that statute.

WATERMAN, Circuit Judge (concurring).

I concur with my colleagues in affirming the judgment below. I would dispose in one sentence of the claim advanced that the applicable statute, 18 U.S.C.A. § 1461, is unconstitutional, for I believe the constitutionality of such legislation is so well settled that: "If the question is to be reopened the Supreme Court must open it. Tyomies Publishing Company v. United States, 6 Cir., 211 F. 385"—quoting Learned Hand, C. J., in United States v. Rebhuhn, 2 Cir., 1940, 109 F.2d 512, at page 514, certiorari denied 310 U.S. 629, 60 S.Ct. 976, 84 L.Ed. 1399. I concur with Chief Judge Clark in his disposition of the remaining issues.